UNITED STATES of America, Plaintiff,

v.

Eugene BOFFA, Sr., et al., Defendants.

Crim. A. No. 80–36.

United States District Court,
D. Delaware.

April 3, 1981.

518

Joel M. Friedman, Edward J. Levitt and Ronald G. Cole, Philadelphia Strike Force, Philadelphia, Pa., Kenneth F. Noto, U. S. Dept. of Justice, Washington, D.C., and James W. Garvin, Jr., U. S. Atty., Wilmington, Del., for plaintiff.

James C. Schwartzman of Schwartzman & Hepps, Philadelphia, Pa., for defendant Eugene Boffa, Sr.

Glenn A. Zeitz of Zeitz & Zeitz, Philadelphia, Pa., for defendant Francis Sheeran.

Thomas C. Carroll of Carroll, Creamer, Carroll & Duffy, Philadelphia, Pa., for defendant Louis Kalmar, Sr.

Ronald F. Kidd of Duane, Morris & Heckscher, Philadelphia, Pa., for defendant Robert Boffa, Sr.

Thomas A. Bergstrom, Philadelphia, Pa., for defendant Chandler Lemon.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

This is the eighth in a series of opinions disposing of the vast array of pretrial motions filed by the defendants in this criminal action, which charges violations of the criminal provisions of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1), the mail fraud statute, 18 U.S.C. §§ 1341 and 2, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). Defendants, Eugene Boffa, Sr., Robert Boffa, Sr., Louis Kalmar, Sr., and Frank Sheeran have moved to suppress certain evidence which they claim the Government received from one Leroy Frank Holman, a/k/a Robert Morgan, a "con man" with a record of convictions spanning 35 years, who purportedly fraudulently represented himself as an attorney to the defendants and received from them confidential communications concerning the criminal activities which are the subject matter of the indictment returned in this case. Defendants claim that Morgan in turn disclosed these confidential communications to the Government, in violation of their respective attorney-client privileges, and that, accordingly, all information derived from these improper disclosures is inadmissible at trial and must be suppressed by the Court. A hearing on defendants' suppression motion was held on December 10–12, 1980, and January 5–9, 1981. (Docket Items ["D.I."] 151, 152, 153, 154, 138, 139, 146, 149, 150; Transcripts Vol. A–I.) In addition, both the defendants and the Government submitted briefs on the pertinent issues. (D.I. 172, 173, 177.) The Court concludes, for the reasons expressed in this opinion, that the defendants have failed to sustain their burden of proving that a governmental invasion of their attorney-client privileges occurred in this case.

### I. Background

Leroy Frank Holman, a/k/a Robert Morgan (hereinafter "Morgan"), has an extensive criminal record dating back to 1944, and has been incarcerated for an approximate total of 15 years for various criminal offenses. (Defendants' Exhibit ["D.S."] 11; Government's Exhibit ["G.S."] 1.) Many of the crimes for which Morgan was jailed involved check or securities frauds, forgeries, income tax evasions and other classes of economic swindles. (*Id.*) At the time of the events which gave rise to the present

motion, Morgan was out of jail on an appeal bond pending disposition of his appeal of a conviction entered in the United States District Court for the Western District of North Carolina for the interstate transportation of a stolen vehicle. (*Id.*)

Morgan never received any formal legal training but apparently acquired some knowledge of legal practice during the course of his intermittent incarcerations in various prisons where he acted as "jailhouse lawyer." (D.S. 11.) In the mid-1960's, Morgan purportedly provided legal research for the attorneys representing Jimmy Hoffa at Hoffa's trial in Chattanooga, Tennessee. (*Id.*) At the trial, Morgan met Frank Sheeran, President of Teamsters Local 326 of Wilmington, Delaware, and a defendant in this action. (*Id.*)

In 1977, after his release from prison pending appeal, and under circumstances which are not entirely clear on the present record, Morgan travelled to the Philadelphia area to assist Frank Sheeran in responding to certain subpoenas which had been issued by a grand jury investigating alleged illegal activities of Sheeran, Eugene Boffa, Sr., and Robert Boffa, Sr. (D.S. 11.) On May 31, 1977, a *pro se* motion bearing Sheeran's signature was filed to quash a subpoena calling for the production by the Philadelphia National Bank of certain records pertaining to Frank Sheeran's account. (D.S. 4.) At a hearing on the motion held on June 6, 1977, before the Honorable Edward Cahn, of the United States District Court for the Eastern District of Pennsylvania, Morgan entered an appearance on behalf of Sheeran, representing to the Court that he was Sheeran's attorney. (D.S. 4.) After argument, Judge Cahn denied the motion, but temporarily stayed the production of the subpoenaed records to allow an appeal to be taken to the Third Circuit Court of Appeals. That afternoon, Morgan went to the Clerk's Office for the Eastern District of Pennsylvania and filed a notice of appeal with the signature of Frank Sheeran. (D.S. 4; D.S. 5.) Shortly thereafter, Morgan returned to Judge Cahn's chambers and argued for a further stay of the subpoena. This motion, however, was denied. (D.S. 4.)

Sometime in June or July of 1977, Sheeran introduced Morgan to Eugene Boffa, Sr., Robert Boffa, Sr., and Louis Kalmar. Under circumstances which are hotly disputed by the defendants and the Government, Morgan agreed to assist the Boffas and Kalmar in responding to grand jury subpoenas for the production of records of certain corporations in which the defendants had an allegedly controlling interest, which subpoenas had been served upon the defendants as custodians of the records. (D.S. 9; Transcript of Hearing ["Tr."] at B–70; B–89; C–3; C–55.) At the time they met Morgan and during the subsequent period in which Morgan allegedly performed legal services for them, the defendants were represented by Peter Willis of the law firm of Boffa & Willis. (Tr. at B–98; C–36; C–54, 55.) In August, 1977, Boffa & Willis filed a motion to quash certain grand jury subpoenas issued *inter alia* to Eugene Boffa, Sr., Robert Boffa, Sr., and Country Wide Personnel, Inc., and Universal Coordinators Inc. ("UCI"), two of the corporations allegedly controlled by the Boffas. (D.S. 4; D.S. 5; Tr. at D–14.) As part of that motion to quash, defendants moved for a temporary restraining order precluding the Government from continuing its grand jury investigation of the defendants. (D.S. 4.) On August 15, 1977, at a hearing on the T.R.O. before Judge VanArtsdalen of the United States District Court for the Eastern District of Pennsylvania, one of the persons who appeared and presented arguments to the Judge was Morgan, who identified himself as a legal advisor to the law firm of Boffa and Willis. (D.S. 4; D.S. 5.)

From August, 1977 to December, 1977, Morgan continued to do legal research for Eugene Boffa, Sr., Robert Boffa, Sr., Louis Kalmar and their affiliated corporations. As compensation for his services, Morgan received a retainer drawn from UCI funds as well as the free use of a car leased by All Purpose Leasing ("APL"), another purported Boffa controlled company. In addition, all of Morgan's living expenses, including hotel bills and food expenses were paid by

UCI. (Tr. at B–77; D.S. 1; D.S. 2a.) In December 1977, however, Morgan disappeared with the car leased to him by APL and APL subsequently filed a stolen car complaint in New Jersey against Morgan. (Tr. at B–136.)

In February, 1978, Morgan was arrested in Long Beach, California, by local police for possession of stolen property. During a routine inventory of the APL car which Morgan had been driving, the police found several cartons of documents, which included some records that Morgan had apparently obtained from certain of the defendants. (Tr. at E–206.) Included within these documents was a slip of paper with the telephone number of the Philadelphia Strike Force and the name of Agent David Coffman, a Department of Labor agent assigned to work with the Strike Force. (Tr. at D–8.) The Long Beach police subsequently notified the Strike Force of Morgan's apprehension and the Strike Force applied for, and received, a federal bench warrant for Morgan's arrest which charged that by misrepresenting himself as an attorney in proceedings in federal court in Philadelphia, he had willfully obstructed a criminal investigation, in violation of 18 U.S.C. § 1510, and made a false statement of material fact to a federal agency, in violation of 18 U.S.C. § 1001. (D.S. 4.) Two FBI agents were dispatched to California to interview Morgan, review the documents found in his car and bring him to Philadelphia. (Tr. at E–205.)

Shortly after Morgan was returned to Philadelphia, a plea agreement was struck between him and the Government under which Morgan agreed to plead guilty to one count of a two count indictment charging violations of 18 U.S.C. § 1001 and to cooperate with the Government. The Government, in turn, agreed to make no recommendation at the time of Morgan's sentencing and to advise the Judge of the extent of Morgan's cooperation. (Tr. at H–192; I–11.) Morgan subsequently was interviewed on at least five occasions over a 10-day period by FBI agents (D.S. 9–13), and under their direction, he attempted to engage in electronically monitored phone conversations with several individuals, including Eugene Boffa, Sr., and Frank Sheeran. (Tr. at D–155, 156.) These efforts proved fruitless (Tr. at D–178), and the FBI agents concluded that Morgan would be of little assistance in their ongoing investigations. (Tr. at D–180; G–32; 38; 100.) Morgan was allowed to return to California to await his sentencing. (Tr. at D–183.) At the time appointed for that purpose in May 1978, however, he failed to appear and a fugitive investigation led by Special Agent Quinn John Tamm of the FBI was initiated. (Tr. at D–186.) This investigation resulted in Morgan's recapture in December, 1979. (*Id.*)

The defendants claim that Morgan fraudulently held himself out to the defendants as an attorney, that the defendants reasonably believed that he in fact was an attorney and that pursuant to this belief, the defendants disclosed confidential communications to Morgan which are protected by the attorney-client privilege. Moreover, the defendants argue that the Strike Force and the FBI were aware that Morgan had established an attorney-client relationship with the defendants, but nonetheless obtained from him privileged communications which the Government used to secure other evidence that it will seek to admit at the trial of these defendants. (D.I. 173 at 1–2.) Consequently, the defendants argue that all evidence which had as its source Morgan's disclosures to the Government, and specifically, evidence obtained as a result of certain grand jury subpoenas issued subsequent to April, 1978, must be suppressed. (D.I. 173 at 27.) [1]

---

1. Defendants' counsel concentrated their efforts at the suppression hearing on ascertaining whether Morgan had provided information as an undisclosed Government informant for an affidavit filed in the United States District Court for the Southern District of Florida, in support of an application authorizing the interception of oral communications in an investigation unconnected with this case. In fact, counsel represented to the Court that the determination of whether Morgan was the informant was essentially the central issue of this suppression

## 522

### II. *Discussion*

While the principal question presented to the Court seemingly concerns a simple application of the attorney-client privilege, the context in which the privilege is raised and the relief requested is decidedly novel and a suitable analogue cannot be found in any reported decision. For the purpose of simplifying the task at hand, the Court first will address the issues which are *not* involved in this proceeding. Clearly, there are no constitutional principles which are in need of vindication. The alleged governmental intrusion into the defendants' attorney-client relationships, which was the focus of the suppression hearing, occurred long before any of the defendants were indicted and thus before their Sixth Amendment right to assistance of counsel had attached. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972); *Massiah v. United States*, 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964). Nor have defendants demonstrated that any other constitutional precept presents grounds for the requested relief.

It is also clear, moreover, that the privileges at stake here are personal to the defendants and that no corporate attorney-client privilege has been properly asserted in this proceeding. Although some of the defendants testified that Morgan was retained to represent UCI, APL and Countrywide Personnel ("CWP") of Jersey City, as well as the individual defendants, any privilege held by these corporations pursuant to Morgan's alleged representation has not been properly claimed by the corporations themselves, for whom the privilege alone exists. Because the corporations are not defendants in this action and did not appear during these proceedings to assert their attorney-client privilege, the parameters of the corporate privilege held by either UCI, APL or CWP of Jersey City are not properly before the Court.

The central issue in this proceeding rests solely on the firmly embedded common-law rule that an attorney cannot disclose confidences entrusted to him by his client without the client's permission, and any appropriate relief to be granted in this case must be fashioned with regard to the historic purposes of, and limitations placed on, that privilege. The attorney-client privilege was created essentially to foster full and frank communication between attorneys and their clients, *see Upjohn v. United States*, —— U.S. ———–——, 101 S.Ct. 677, 681, 66 L.Ed.2d 584 (1981), and "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). The courts traditionally have assumed that the information necessary for the tendering of competent legal assistance will be forthcoming only if the client can consult with his attorney free from the apprehension or consequences of disclosure. *Upjohn v. United States, supra,* —— U.S. at ——, 101 S.Ct. at 681; *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). Accordingly, it has long been recognized that such confidences are at the instance of the client permanently protected from outside intrusion.

Although the attorney-client privilege in theory serves these salutary purposes, because the privilege also "obstructs the search for the truth" and because its benefits are at best "indirect and speculative," it has traditionally been "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proceedings* (FMC Corp.), 604 F.2d 798, 802 (C.A.3, 1979). The burden of establishing the existence of the attorney-client privilege predictably rests on the party asserting the privilege. *United States v. Costanzo*, 625 F.2d 465, 468 (C.A.3, 1980); *In re Matter of Grand Jury Empan-*

---

hearing. (Tr. at E 25–26.) Towards the end of the hearing, the Government revealed that the informant in question was Robert Rispo, one of the co-defendants in this action, and not Morgan. (Tr. at H 101–102.)

elled Feb. 14, 1978 (Markowitz), 603 F.2d 469, 474 (C.A.3, 1979); International Paper Co. v. Fibreboard Corp., 63 F.R.D. 88, 93 (D.Del.1974). Generally in order to satisfy this burden, the party claiming the privilege must prove each and every one of the following criteria:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of the court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication related to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding and not (d) for purposes of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358 (D.Mass.1950).

■ The proceeding before the Court presents one significant deviation from this classic formulation in that both sides agree that Morgan was not a member of the bar of a court at the time that he purportedly represented the defendants. Nonetheless, the rationale behind the privilege equally supports the theory that the privilege should be extended to those who make confidential communications to an individual in the genuine, but mistaken, belief that he is an attorney. 8 Wigmore, Evidence, § 2302 (McNaughton Rev. 1961); see Dabney v. Investment Corp. of America, 82 F.R.D. 464, 465 (E.D.Pa.1979). Prudence dictates that such a belief should be reasonable in order to lay claim to the protections of the privilege and that a "respectable degree of precaution" in engaging the services of the "attorney" must be demonstrated. Wigmore, supra, at § 2302. Where such a belief is proved, however, the client should not be compelled to bear the risk of his "attorney's" deception and he should be entitled to the benefits of the privilege as long as his bona fide belief in his counsel's status is maintained.

■ Based on these general principles, in order to qualify for the relief sought each individual defendant was first required to prove: (1) that Morgan fraudulently held himself out to the defendant as an attorney; (2) that the defendant genuinely and reasonably believed that Morgan was an attorney; and (3) that pursuant to this belief, the defendant made confidential communications to Morgan in accordance with the criteria outlined in United States v. United Shoe Machinery Corp., supra. Once the foregoing three elements were established, the defendants then had the burden of demonstrating (4) that Morgan disclosed to the Government the confidential communications he received from the defendants; and (5) that the Government used these disclosures as a source for obtaining other evidence that it intends to use at the trial of the defendants. If the defendants had met their burden of proof on these issues, the Government would then have had the ultimate burden of establishing that its proof at trial had an independent origin, untainted by the improperly obtained evidence. See Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1967); Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); (D.I. 109; Tr. at E-4, 6). The Court finds, however, that the defendants have failed to satisfy the five requisite criteria necessary to obtain the requested relief.

A. *Was an Attorney-Client Relationship Established Between Morgan and the Defendants.*

■ Eugene Boffa, Sr., testified at the hearing that in mid-1977 Morgan was recommended to him as a "good lawyer" by Frank Sheeran who advised Boffa that Morgan had at one time represented Jimmy Hoffa. (Tr. at B-70). At the time of this conversation, several grand jury subpoenas had been served on Boffa for the production of certain corporate records and Boffa anticipated problems in complying with those subpoenas. (Tr. at B-70, 71.) Boffa didn't tell Sheeran that he was interested in

retaining Morgan, but a few days after this conversation, Morgan mysteriously appeared in New Jersey and met with Boffa. (Tr. at B–134.) Boffa, who himself holds a law degree, further testified that he spent a great deal of time interviewing Morgan and that prior to Morgan's retention, Boffa took him to the law firm of Boffa & Willis so that Peter Willis, a specialist in criminal law, could interview him. (Tr. at B–75.) Morgan also allegedly spoke with Maurice Brigadier and Seymour Marguilies, two other New Jersey lawyers who, according to Boffa, advised him that they thought Morgan "could be of some assistance" in responding to the subpoenas. (Tr. at B–75, 76.) Unfortunately, neither Willis, Brigadier nor Marguilies testified at the hearing.

Boffa stated that he was "convinced" that Morgan was a lawyer, although he conceded that he never discussed with Morgan, or independently investigated, his credentials. (Tr. at B–115.) Robert Boffa, Sr., and Louis Kalmar also both testified that Morgan had been introduced to them as an attorney by Eugene Boffa, and that they genuinely believed that he was an attorney. (Tr. at C–3, 53.) Curiously, Frank Sheeran, who had known Morgan for over ten years prior to the pertinent events, and who alone could have shed some light on the circumstances under which Morgan came to New Jersey and allegedly was retained by the Boffas and Kalmar, did not testify at the hearing.

The financial arrangements under which Morgan was compensated for his services were clearly peculiar. As mentioned previously, although Morgan was retained to represent Eugene Boffa, Robert Boffa and Kalmar individually, as well as UCI, APL and Countrywide Personnel of Jersey City (Tr. at B–89), Morgan received financial benefits for his services only from UCI, which paid Morgan's hotel bills, food expenses, incidental costs and a fee, and APL which provided him the free use of an automobile. Many of Morgan's living expenses were paid by UCI directly to the hotel or landlord. (D.S. 2a.) In addition, while certain of the expenses paid by UCI on Morgan's behalf were charged to its "profes-

sional fee legal" account, many of the expenses were charged to the "driver's expense" or "office rent" corporate accounts. (Id.) Under questioning by the Court, Eugene Boffa conceded that he had never either previously or subsequent to Morgan, paid an attorney expenses and fees in the manner in which Morgan was compensated. (Tr. at 136–37.)

Two Government agents presented evidence rebutting defendants' claims that they believed Morgan was an attorney. Special Agent Francis G. McGrath of the Department of Labor testified that Morgan informed him during an interview that he had never represented himself to any of the defendants as an attorney. (Tr. at C–149.) In addition, Special Agent Quinn John Tamm of the FBI testified that he questioned Robert Rispo, a defendant in this action who entered a guilty plea to Count I of the indictment on March 16, 1981, and at one time a Government informant, about Morgan. At the time that Morgan allegedly was doing legal research for the defendants and their affiliated companies, Rispo was employed as Director of Personnel Services at UCI and had an employment relationship with certain other companies allegedly controlled by the defendants. (Tr. at H–105.) Tamm testified that Rispo told him:

that it was [Rispo's] opinion at the time that Sheeran knew that Morgan was not a lawyer, but that he was somebody—he was kind of like a Teamster groupie, if I can style him like that, and he was a hanger-on, and he had come to Sheeran, and Sheeran wanted to stash him in Boffa's company, and that's what they did, but that Sheeran and Boffa and Rispo and all of them had an understanding that Morgan was not a lawyer and that—knew very little about the law, he had been in jail, and that was why he was—they were just keeping him around.

(Tr. at H–115.) Tamm further testified:

[Rispo] told me that Boffa had told Morgan the only reason he had him around was he was doing it as a favor to Frank

Sheeran. He said, "You know, you're in here looking for a handout, wanted to take our best cars out, you're running up a hell of a bill at the hotel." There was a dispute over whether they were going to pay for Morgan's laundry. Apparently they were trying to get rid of Morgan, kind of run him off.

(Tr. at H–114.)

Based on the testimony and exhibits presented at the hearing, the Court finds that the defendant Frank Sheeran clearly has failed to meet his burden of proving that Morgan fraudulently held himself out to Sheeran as an attorney and that Sheeran genuinely and reasonably believed that Morgan was an attorney. Virtually no evidence was adduced at the hearing to demonstrate what Sheeran's state of mind actually was with respect to Morgan or what precautions, if any, Sheeran took to ascertain Morgan's status. In fact, the only evidence which could be considered favorable to Sheeran on this issue was the uncorroborated testimony of Eugene Boffa, Sr., that Sheeran had told Boffa that Morgan was an attorney and the fact that Morgan had represented to Judge Cahn that he was an attorney for Sheeran. This evidence is too insubstantial to justify the conclusion that Sheeran actually *believed* that Morgan was an attorney and consulted him in that capacity. It is possible, for example, that Sheeran may have known that Morgan was not an attorney and nonetheless advised Eugene Boffa that he was in order to "stash him in Boffa's company." (Tr. at H–115.) Moreover, in light of the many unanswered questions surrounding defendants' rather tenuous factual claims, Sheeran's failure to testify was not only a conspicuous omission, but in all probability deprived the Court of material information concerning Morgan's initial contacts with the defendants which may have greatly clarified the factual record in this proceeding. Without either Sheeran's own testimony or more specific evidence concerning the relationship between Sheeran and Morgan, the Court simply cannot conclude that

Sheeran has met his burden of proving that an attorney-client relationship existed between him and Morgan.

The evidence presented on this issue by defendants Eugene Boffa, Sr., Robert Boffa, Sr., and Louis Kalmar, albeit considerably more substantial than that offered by Sheeran, was inconclusive. Although all three defendants testified that they genuinely believed that Morgan was an attorney, the evidence presented by the Government agents, the suspicious circumstances surrounding the formation of Morgan's employment relationship with the defendants, the unusual arrangement by which Morgan was compensated, the sometime spurious activities in which Morgan either participated on defendants' behalf or to which he was a witness, as further explicated in the FBI reports discussed later in this opinion, and the sheer improbability of defendants' factual contentions militate against a finding in defendants' favor. After carefully considering the weight and sufficiency of the testimony at the hearing and the documentary evidence admitted, the Court concludes that these defendants likewise have failed to prove that they genuinely and reasonably believed that Morgan was an attorney. Because of the closeness of this question, however, the Court does not rest its denial of the Boffas' and Kalmar's motion to suppress on this ground alone, but concludes that these defendants also have failed to satisfy the other prerequisites for obtaining relief.

**B. *Were Confidential Communications Made to Morgan by the Defendants Which Were Later Disclosed to the Government.***

Even if the Court were to find that defendants Eugene Boffa, Sr., Robert Boffa, Sr., and Louis Kalmar genuinely and reasonably believed that Morgan was an attorney, these defendants have failed to demonstrate that they made confidential communications to Morgan and that these same communications were revealed to the

Government.[2] Obviously if defendants had regarded Morgan as their personal attorney, certain confidential communications in all likelihood would have been disclosed to him. In addition, the testimony and documents introduced at the hearing established that Morgan did, in fact, disclose certain information to FBI agents about the defendants. The mere interchange of information between Morgan and the defendants on the one hand, however, and Morgan and the FBI agents on the other, would be too tenuous a basis on which to conclude that defendants' attorney-client privileges were violated and that evidence gained through grand jury process issued after Morgan's discussions with the Government should be suppressed. *See United States v. Fanning*, 477 F.2d 45, 48 (C.A.5), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973). Defendants, accordingly, were required to establish through more definite and particularized proof that their attorney-client privileges were breached. Such proof was not forthcoming at the pretrial hearing, however.

Defendants Eugene Boffa, Sr., Robert Boffa, Sr., and Louis Kalmar all testified in the most general terms that they disclosed virtually "everything" about the operations of their companies to Morgan. Eugene Boffa testified that he explained to Morgan how the labor leasing business functioned and reviewed with him at great length different labor leasing contracts. (Tr. at B-90.) In addition, Boffa stated that he told Morgan everything he knew about APL and that Morgan had "carte blanche" to look through the books, records and documents of UCI, APL and CWP of Jersey City. (Tr. at B-90.) Robert Boffa testified that he met with Morgan several days a week for several hours a day during the time that Morgan "represented" the defendants, that he discussed with Morgan his relationship to the various companies and that he specifically delineated his involvement in UCI's labor leasing activities at the Continental Can facility in Van Wert, Ohio. (Tr. at C-3, 10.) In addition, Robert Boffa also allegedly discussed with Morgan the fact that Frank Sheeran was leasing a car from APL. (Tr. at C-42.) Kalmar testified that he discussed with Morgan the relationship between UCI and APL and all the details within his possession about Sheeran's automobile arrangements with APL. (Tr. at C-57.)

Although the defendants were not necessarily required to disclose in the pretrial hearing the exact contents of conversations which they assert are privileged, they were required to lay a more specific factual foundation for their claims. Because application of the privilege often results in the inadmissibility of probative evidence, the burden of proof placed on the defendants must be strictly observed. This burden cannot be discharged by mere conclusory or *ipse dixit* allegations, *see In Re Bonanno*, 344 F.2d 830, 833 (C.A.2, 1965), particularly in cases like this where the defendants seek to suppress not only their own communications but a whole range of evidence obtained through legitimate governmental investigative efforts.[3] The Court cannot discern, based on the above testimony, that defendants have met their burden of proving the necessary elements of *United States v. United Shoe Machinery Co., viz.,* that specific statements in certain defined areas were made by any of the defendants to Morgan, without the presence of strangers, and for the purpose of securing either an opinion of law, legal services or assistance in some legal proceeding. Defendants' blanket assertions that they discussed "everything" with Morgan about certain general topics, which coincidentally track the major issues outlined in the indictment,

---

**2.** Because Sheeran never testified at trial, there was no evidence introduced to demonstrate what, if any, confidential communications were made by him to Morgan. Accordingly, Sheeran clearly has not met his burden of proving the existence of privileged communications under *United States v. United Shoe Machinery Corp.*

**3.** Although defendants maintain that the Strike Force and the FBI were aware that Morgan had established an attorney-client relationship with the defendants and purposely sought to obtain the fruits of that relationship, the evidence at the hearing does not support this contention.

are an inadequate basis on which to conclude that privileged attorney-client confidences were made to Morgan.

The information which Morgan disclosed to the Government, moreover, which is contained in reports prepared by the FBI agents who interviewed him, does not supply the missing evidentiary material necessary to support defendants' claims of privilege. These reports reveal that Morgan did discuss certain information concerning defendants and their operations with the FBI, but it is impossible to ascertain on the face of these documents from what source Morgan obtained his information—whether it .was from Kalmar, Eugene Boffa or Robert Boffa, from Sheeran, from sources other than the defendants or from pre-existing documents. This information is critical, however, to defendants' contentions and the Court cannot assume, as defendants suggest, that this information "could only have come from the defendants themselves" during the course of their privileged attorney-client relationship with Morgan. (D.I. 173 at 10.) Many of the documents, in fact, indicate that Morgan received much of his information from Sheeran whose communications to Morgan are not privileged. (D.S. 9 at 1; D.S. 10 at 1; D.S. 11 at 3; D.S. 12 at 1–2; D.S. 13 at 1.) At least some of the documents indicate, moreover, that Morgan obtained some of his information from sources other than the defendants. In the interview of March 24, 1978, for example, Morgan stated that Boffa was making cash kickbacks to Ed Feskins who worked for Crown, Cork and Seal and that these kickbacks were delivered to Feskins by Frank Sheeran. (D.S. 10 at 2.) Morgan further stated, however, that he learned of this information through conversations with Feskins (id.) whose communications would not be privileged. In the interview of March 27, 1978, Morgan told the FBI agents that Boffa routinely gives away automobiles as his method of kickback payments to labor leaders in the Teamsters Union. (D.S. 11 at 2.) Morgan did not indicate from whom he received this information, but he stated that Boffa knew an individual named "Irene" at the Department of Motor Vehicles office in Jersey City, New Jersey, who assisted Boffa in providing phony titles and registrations for the cars. (Id.) Morgan further stated that he had spoken to Irene several times. (Id.) The information received from Irene also would not fall within the scope of any attorney-client privilege.

■ As further and additional grounds for rejecting defendants' contentions of privilege, the Court finds that many of the disclosures made by Morgan to the FBI indicate that if Morgan was consulted by the defendants, in many instances it was not with respect to past wrongdoing but to future illegal activity for which an attorney-client privilege is not applicable. See In re Grand Jury Proceedings (FMC Corp.), supra, 604 F.2d at 802; United States v. Fanning, supra, 477 F.2d at 48. The FBI reports indicate that at the time Morgan was allegedly representing the defendants, they were involved in certain ongoing criminal activities and communications between Morgan and the defendants concerning plans to implement these activities would not be privileged. For example, on March 24, 1978, Morgan advised the FBI that Sheeran was involved in loan sharking activities in which he had acted as a "go between" for Larry Smith and Russell Buffalino. (D.S. 10 at 1.) In this regard, Morgan stated that he had personally witnessed cash payments being passed between Sheeran and Smith. (Id.) Accordingly, any information communicated to Morgan about these loan sharking activities would fall within the crime-fraud exception to the attorney-client privilege and could not properly be suppressed. Similarly, Morgan also advised the FBI agents that while he was working for Boffa, Boffa had devised a scheme to withhold from the Grand Jury certain documents subpoenaed from CWP of California. Boffa purportedly directed Robert DeWann, head of CWP of California, to ship the subpoenaed records to Universal Labor Services ("ULS") in New Jersey, apparently to ensure that they were out of reach of the Grand Jury. (D.S. 10 at 2.) Morgan stated that he picked up the documents in

August, 1977, and delivered them to ULS. (*Id.*) Not only would this information not be privileged, but it could arguably form the basis for an obstruction of justice aiding and abetting charge against Morgan.

The FBI documents are further replete with evidence that Morgan received information from the defendants about current criminal activities which could not possibly be characterized as privileged. Morgan told FBI agents that he had been present when Sheeran had made cash payments to Russell Buffalino at Vassivio's Restaurant in New York. (D.S. 11 at 3.) In addition, he stated that Sheeran had received a free car as a kickback from Boffa (D.S. 11 at 2), and that Morgan had been with Sheeran in early June, 1977, when Sheeran had obtained a loan from a bank purportedly in order to pay Boffa for the vehicle. (D.S. 12 at 2.) Morgan stated that shortly after this transaction Robert Boffa obtained New Jersey license plates for Sheeran's car from Irene in the Motor Vehicle Office in New Jersey. (*Id.*) He also stated that it was his impression that Sheeran had not, in fact, actually tendered the loan money to Boffa for the car, but instead, through manipulations between the bank and Boffa, had managed to keep the money. (*Id.*)

The foregoing observations point out the defects in defendants' proof and the importance of a more precise delineation than defendants offered of the actual attorney-client confidences allegedly made by the defendants to Morgan, without which the Court was unable meaningfully to determine that their attorney-client privileges had been violated.[4] Accordingly, the Court finds that defendants Eugene Boffa, Sr., Robert Boffa, Sr., and Louis Kalmar have failed to meet their burden of demonstrating that they made specific confidential communications to Morgan and that these same confidential communications were disclosed to the Government.

## C. *Did the Government Use Any Information Obtained from Morgan as a Source for Other Evidence.*

The Court also concludes that defendants have failed to establish that the Government used any information obtained from Morgan as a source for other evidence which it intends to use at the trial of the defendants, and accordingly, defendants' motion to suppress must be denied on this separate and independent ground.

The three Government agents who interviewed Morgan after his apprehension in February, 1978, all testified that the information Morgan provided was relatively worthless and that no investigative leads were developed as a result of his disclosures. Agent McGrath of the Department of Labor, who interviewed Morgan on one occasion, testified that Morgan discussed with him in general terms the relationship between CWP of Jersey City and the other Countrywide Personnel companies located throughout the nation (Tr. at C–123), but did not discuss the operations of UCI (Tr. at C–121), or APL (Tr. at C–123). Agent McGrath further testified that he concluded that Morgan's information was not helpful (Tr. at 149) and accordingly made no notes of their conversation. (Tr. at C–144.)

Special Agent Tamm of the FBI, who was assigned to work on investigations relating to Sheeran and Boffa which were unconnected to the present indictment (Tr. at D–129), testified that he met with Morgan on several occasions and that his main concern was to use Morgan to monitor conversations with individuals in whom Tamm had an investigative interest (Tr. at D–143). Under Tamm's directions, Morgan contacted Sheeran to set up a meeting which would have been electronically recorded by the FBI, but Sheeran apparently rebuffed Morgan's overtures in no uncertain terms and Tamm subsequently concluded that Morgan would be of little assistance in his ongoing investigations. (Tr. at D–180; H–120.)

4. The Court repeatedly advised defense counsel during the suppression hearing that they needed to adduce more specific evidence concerning the confidential communications which had allegedly been made by the defendants to Morgan in order to meet their burden of proof under *United States v. United Shoe Machinery Corp.* (Tr. at C–18; E–6, 62, 195.)

Tamm conceded at the hearing that during the course of the interviews, Morgan disclosed to him certain information which Tamm had not previously heard. (Tr. at E–17, 28; H–121, 126.) Nonetheless, Tamm testified that he never attempted to verify or pursue this information. (Tr. at E–29; H–119, 139, 144, 168, 172, 184, 185, 188), and that he never discussed Morgan's disclosures with any of the prosecuting attorneys in the Strike Force (Tr. at H–127, 129, 133, 157, 184, 185, 186). Tamm also testified that he was not aware of the specific subpoenas issued to the Boffa associated companies or the returns on the subpoenas (Tr. at H–171), and that he was neither familiar with the terms of the indictment nor consulted by anyone at the Strike Force in connection with the drafting of the indictment. (Tr. at E–14; H–130.)

Special Agent John Huntley of the FBI, who was investigating alleged criminal activities in Delaware involving Frank Sheeran at the time he interviewed Morgan (Tr. at E–236), testified that the information furnished by Morgan was very general in nature. (Tr. at G–32.) Huntley checked through the FBI files after his meetings with Morgan in an attempt to corroborate and evaluate Morgan's information and concluded that it was "the type of information which we knew, or if we didn't know,

didn't appear to be of substantive value." (*Id.*) Moreover, Huntley stated that in his opinion Morgan's disclosures were "very nominal, minimal type of information that would be difficult to corroborate and even more difficult to utilize considering the potential witness...." (Tr. at G–100.) Huntley also testified that he didn't recall making any attempts to develop further any of the information provided by Morgan. (Tr. at G–21, 59–60, 66, 74, 82, 91.) [5]

Huntley also testified that he had general discussions about Robert Morgan with Edward Levitt, the assistant attorney in charge of the Strike Force who presented the case against the defendants to the grand jury (Tr. at G–80), but that he did not advise Levitt of the substantive details of his interviews with Morgan. (Tr. at G–108.) Although Huntley's testimony was at times unclear, he stated: (1) that Levitt never requested the FBI reports of the Morgan interviews (Tr. at G–110); (2) that it was normal procedure to record the offices outside the FBI that had received FBI reports and that there was no record that the Morgan reports were ever sent to the Strike Force (Tr. at G–120); (3) that Levitt did not have access to Huntley's investigative file on Sheeran and could have learned what was in the investigative file only through Huntley (Tr. at G–111–112); and

---

**5.** The record at the suppression hearing indicates that Huntley did follow up on certain information provided by Morgan through the FBI offices in New York but apparently no additional information of any value was produced as a result. Huntley sent a teletype to the New York office on March 30, 1978, requesting it to ascertain whether it had any records or could provide any information concerning an individual known only as "Mildred," who according to Morgan was an accountant for APL who had been requested by Eugene Boffa to doctor the books pertaining to the car leased to Sheeran. (Tr. at G–168; D.S. 12 at 2.) The teletype also requested information on Marie Falcone, who purportedly was knowledgeable about Boffa's operations, and Universal Labor Services, the company which according to Morgan received the corporate records that Eugene Boffa wanted to conceal from the grand jury. (Tr. at G–168; D.S. 9 at 2; D.S. 10 at 2). Huntley testified that there was no record of any response to the teletype from the New York office and that he could not recall

whether one was actually made. (Tr. at G–169). Huntley further testified that he never attempted to interview "Mildred" (Tr. at G–21), and that he checked his investigative files for references to Marie Falcone and does not recall seeing any substantive information concerning her. (Tr. at G–92.) He further stated that he did not recall making any attempt to interview Ms. Falcone. (Tr. at G–21.) "Mildred," whose real name apparently is Carmella Tentoni (Tr. at H–6), was known to the Government prior to March 1978, when Morgan was interviewed by Government agents, and had apparently previously been called to testify before a grand jury where she asserted her Fifth Amendment right to remain silent. (Tr. at H–8.) Subsequently, Ms. Tentoni was granted immunity and was interviewed extensively by Government agents. (Tr. at H–6.) She was resubpoenaed before the grand jury again in July, 1979. (D.S. 58.) Marie Falcone was also subpoenaed by the grand jury in late 1979 and invoked her Fifth Amendment right to silence (Tr. at H–12–14).

(4) that Huntley never met with any of the Strike Force attorneys concerning the Sheeran/Boffa investigation from April 1, 1978 through October, 1979, the time that Huntley terminated his participation in the investigation. (Tr. at G–116.)

The prosecuting attorneys involved in this case confirmed that none of the information provided by Morgan to the FBI agents was disclosed to the Strike Force. Edward Levitt testified that he was advised that the FBI intended to use Morgan to tape record conversations with certain individuals, but that Morgan had provided nothing of substance to Government agents concerning the Sheeran/Boffa investigations. (Tr. at D–34.) Levitt further stated that he was never informed of the contents of Morgan's discussions with Huntley or Tamm (Tr. at D–101), and that Agent McGrath indicated to Levitt that nothing significant had come out of his conversation with Morgan. (Tr. at D–46.) Finally, Levitt testified that as the prosecuting attorney he was familiar with all the documents and witnesses that related to the investigation (Tr. at D–94) and that none of this evidence was obtained either directly, or indirectly, from Morgan. (Tr. at D–93.) Ronald Cole, the Strike Force attorney who is presently charged with bringing the defendants to trial and who prosecuted Morgan on the § 1001 violations, testified that he had very limited knowledge of the Sheeran/Boffa investigation in February, 1978 (Tr. at I–6), that he never ·evaluated the information received from Morgan, but instead left that responsibility to the Government agents (Tr. at I–14), and that he never reviewed the Morgan FBI reports until the suppression hearing in this case. (Tr. at I–30.)

There was also substantial evidence introduced at the hearing that the FBI agents were not disposed to share the information they received from Morgan with either the Strike Force or the Department of Labor agents investigating Sheeran and Boffa. In February, 1978, the FBI's involvement in the Sheeran/Boffa case apparently was considerably reduced and the Department of Labor agents assumed more significant responsibility for the investigation. (Tr. at

D–99; G–33.) Because of suspected leaks in the investigation, however, cooperation between the FBI and Depa⸱ ᵗment of Labor agents was poor (Tr. at G ⸱150, 151), and information, including the Morgan FBI reports, was not freely exchanged between the two agencies. (Tr. at G–147, 150; C–177.) In addition, Ronald Cole testified that there was some strain between Agents Tamm and Huntley, and the Strike Force and that in his opinion the FBI agents "were not at that time interested in providing information to the Strike Force." (Tr. at I–15, 16, 67–68.) It is thus highly unlikely that Levitt, and the Department of Labor agents assigned to the Strike Force, who were responsible for issuing the grand jury subpoenas after March 1978, were aware of the disclosures made by Morgan to the FBI agents and targeted the witnesses to be subpoenaed with that information in mind.

The Court concludes for the reasons expressed above that the defendants have failed to prove that the Government used any information it obtained from Morgan as a source for evidence it intends to use at the trial.

### D. Documents Found in Morgan's Car.

Defendants also contend that many of the documents found in Morgan's car when he was apprehended in California reflect confidential communications between attorney and client which must be suppressed and which cannot form the basis for any evidence which will be admitted at trial. The Government has represented that none of these documents will be introduced at trial. (D.I. 96.)

■ The Court has examined the specific documents referred to in defendants' brief (D.I. 173 at 14; D.S. 3, 22–27; 29–30; 33), and concludes that most of these documents, on their face, could not possibly be characterized as privileged. These documents include copies of: (1) a directory containing the names and phone numbers of certain companies and individuals apparently belonging to one of the defendants; (2)

two letters from Louis Kalmar to a Certified Public Accountant; (3) a memorandum written by a Government agent to someone at UCI concerning records subpoenaed by the grand jury; (4) a list of the stockholders of UCI; (5) a letter from Robert DeWann of CWP of California to Eugene Boffa, Sr., dated March 4, 1976, concerning the disposition of funds of CWP of California; (6) a house lease between UCI and Ben and Marilee Shafer for the benefit of Robert Morgan; (7) a contract between UCI and Western Electric Company; (8) a draft of a contract between NL Industries and CWP, Inc.; (9) an agreement between CWP, Inc., and the Allied Services Division, Brotherhood of Railway, Airline, and Steamship Clerks, A.F.L.–C.I.O.; (10) a memorandum from David Martin, an attorney, to the file summarizing a meeting he had with officials of the Strike Force; and (11) a memorandum from David Martin to the file summarizing a meeting he had with David Margolis, Deputy Chief of the Organized Crime and Racketeering Section of the Department of Justice. None of these documents facially reflect confidential communications made by any of the defendants to an attorney for the purpose of seeking legal advice, and defendants have failed to demonstrate that they otherwise contain privileged material.          .

The three remaining documents claimed as privileged by the defendants are: (1) a memorandum from Robert Morgan to Eugene Boffa concerning defendants' efforts to quash certain grand jury subpoenas (D.S. 3); (2) a draft of a proposed memorandum in support of a motion to quash grand jury subpoenas (D.S. 33); and (3) a memorandum to the file dated May 31, 1977, concerning an interview between Peter Willis, of Boffa & Willis, and Louis Kalmar (D.S. 3). Of these three documents, only one, the May 31, 1977 memorandum written by Peter Willis, was brought to Levitt's attention prior to the time the Sheeran/Boffa investigation had begun to wind down and the prosecution memorandum, recommending that indictments be returned against the defendants and summarizing the evidence gathered in the investigation, had been written. In April, 1978, Huntley showed Levitt a copy of the May 31, 1977 memorandum and subsequently recorded the following observations of their discussion:

> With respect to the memorandum dated May 31, 1977, LEVITT reviewed the document and stated that it was a self-serving memorandum written by MORGAN and that the material set forth in the memorandum pertain to testimony given in the U. S. District Court, which was an open hearing. LEVITT denied that any Federal Grand Jury (sic) had ever been summarized and released to MORGAN, PETER WILLIS or LOUIS KALMAR.

(D.S. 46 at 4.)

Even if the Court were to assume that the May 31, 1977 memorandum contained privileged information, it is clear that Levitt did not consider the document worthy of further investigation and no evidence could be said to have been generated by its contents. Moreover, Levitt testified that none of the documents found in Morgan's car were used, either directly or indirectly, in the investigation. (Tr. at D–100.) This assertion was corroborated by Department of Labor Agent Roger Riedley who testified that none of the Department of Labor agents saw any of the documents, including the May 31, 1977 memorandum, until August, 1979, when the investigation was nearing completion, and after the time most of the subpoenas challenged by the defendants were issued. Riedley further stated that none of the documents were used in any way to develop additional information. (Tr. at C–239.)

Accordingly, the Court finds that defendants have failed to prove that any of the documents found in Morgan's car were used to obtain evidence which will be introduced at trial, and defendants' motion to suppress these documents, or evidence derived therefrom, will be denied.

*Conclusion*

For the reasons expressed in this memorandum opinion, defendants' motion to sup-

press all physical evidence obtained from Robert Morgan will be denied.

The above opinion shall constitute the Court's findings of fact and conclusions of law.

An order will be entered in accordance with this opinion.