# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 96-4108

———————

|  |  |
|---|---|
| In re:  Grand Jury Subpoena Duces Tecum | * Appeal from the United States<br>* District Court for the<br>* Eastern District of Arkansas. |

———————

Submitted:  February 13, 1997

Filed:  April 9, 1997

Amended and Unsealed:  May 2, 1997

———————

Before BOWMAN and WOLLMAN, Circuit Judges, and KOPF,[1] District Judge.

———————

BOWMAN, Circuit Judge.

The Office of Independent Counsel (OIC) appeals from an order of the District Court denying the OIC's motion to compel the production of documents subpoenaed by a federal grand jury.  We reverse and remand.

———————

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

The task assigned to Independent Counsel Kenneth W. Starr is to investigate and prosecute matters "relating in any way to James B. McDougal's, President William Jefferson Clinton's, or Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan Association, Whitewater Development Corporation, or Capital Management Services, Inc." In re Madison Guar. Sav. & Loan Ass'n, Div. No. 94-1, Order at 1-2 (D.C. Cir. Sp. Div. Aug. 5, 1994). Mr. Starr also is charged with the duty of pursuing evidence of other violations of the law developed during and connected with or arising out of his primary investigation, known generally as "Whitewater." See id. See generally United States v. Tucker, 78 F.3d 1313 (8th Cir.), cert. denied, 117 S. Ct. 76 (1996).

On June 21, 1996, as part of its investigation, the OIC directed to the White House a grand jury subpoena that required production of "[a]ll documents created during meetings attended by any attorney from the Office of Counsel to the President and Hillary Rodham Clinton (regardless whether any other person was present)" pertaining to several Whitewater-related subjects. Subpoena Rider at 1. The White House identified nine sets of notes responsive to the subpoena but refused to produce them, citing executive privilege, attorney-client privilege, and the attorney work product doctrine.

On August 19, 1996, the OIC filed a motion before the District Court to compel production of two of the nine sets of documents identified by the White House. The first set of documents comprises notes taken by Associate Counsel to the President Miriam Nemetz on July 11, 1995, at a meeting attended by Mrs. Clinton,

Special Counsel to the President Jane Sherburne, and Mrs. Clinton's personal attorney, David Kendall. The subject of this meeting was Mrs. Clinton's activities following the death of Deputy Counsel to the President Vincent W. Foster, Jr. The documents in the second collection are notes taken by Ms. Sherburne on January 26, 1996, during meetings attended by Mrs. Clinton, Mr. Kendall, Nicole Seligman (a partner of Mr. Kendall's), and, at times, John Quinn, Counsel to the President. These meetings, which took place during breaks in and immediately after Mrs. Clinton's testimony before a federal grand jury in Washington, D.C., concerned primarily the discovery of certain billing records from the Rose Law Firm in the residence area of the White House.

The White House abandoned its claim of executive privilege before the District Court, relying solely on the attorney-client privilege and the work product doctrine. Mrs. Clinton also entered a personal appearance through counsel in the District Court and asserted her personal attorney-client privilege. The District Court found it unnecessary to reach the broadest question presented by the OIC, whether a federal governmental entity may assert the attorney-client privilege or the work product doctrine in response to a subpoena by a federal grand jury. Instead, the court concluded that because Mrs. Clinton and the White House had a "genuine and reasonable (whether or not mistaken)" belief that the conversations at issue were privileged, the attorney-client privilege applied. Memorandum Opinion and Order at 20. In addition, the court held that the work product doctrine prevented disclosure of the notes to the grand jury. See id. at 22.

The OIC appealed, and we granted expedited review. Mrs. Clinton moved to intervene formally, and we granted her motion. The case was submitted following oral arguments in a closed session. The District Court did not find it necessary to examine

the disputed materials in camera, see id. at 18 n.10, and neither do we.[2]

At the request of the White House, and in order to preserve the secrecy of the grand jury's proceedings, we filed our opinion under seal on April 9, 1997, intending to publish a redacted opinion shortly thereafter. Since we filed our opinion, however, press reports have related some of the substance of our decision. Believing that these disclosures have portrayed the White House in an unfairly negative light, the White House and Mrs. Clinton moved this Court to publish its opinion and to unseal the briefs and appendices filed in this Court, and the OIC joined in the motion. The motion is granted. Accordingly, this opinion, as amended, together with Judge Kopf's dissent, is released for publication, and the briefs and appendices are ordered unsealed.

## II.

We first consider our jurisdiction to entertain this appeal. An order of a district court denying a motion to quash a grand jury subpoena-- that is, an order requiring compliance with the subpoena--is not immediately appealable. See Cobbledick v. United States, 309 U.S. 323, 327-28 (1940). But see United States v. Nixon, 418 U.S. 683, 691-92 (1974) (determining that, in unique context of case, President could appeal without first being cited for contempt). This case presents the opposite situation: an order refusing to require compliance with a subpoena. An order granting a motion to quash a subpoena is an appealable order, either under 18 U.S.C. § 3731 (1994) (permitting government to appeal from an order "excluding evidence . . . in a criminal

---

[2]We wish to commend the parties on the quality of their briefs and oral arguments despite the expedited appeal process.

proceeding"), or under 28 U.S.C. § 1291 (1994) (permitting appeals from "all final decisions of the district courts"). See In re Grand Jury Subpoena (Kent), 646 F.2d 963, 967-68 (5th Cir. Unit B June 1981); In re Grand Jury Empanelled Feb. 14, 1978 (Colucci), 597 F.2d 851, 854-58 (3d Cir. 1979). It makes no practical difference that the instant case involves the denial of a motion to enforce a subpoena rather than the grant of a motion to quash a subpoena. We conclude that we have jurisdiction over this appeal.

Although this case is a dispute between two entities of the federal government, i.e., the White House and the OIC, it presents a justiciable controversy. See Nixon, 418 U.S. at 697.

### III.

We will address first the issue that the District Court found it unnecessary to decide: whether an entity of the federal government may use the attorney-client privilege to avoid complying with a subpoena by a federal grand jury. Before we confront the merits of this question, however, we believe it is important to identify what is not at issue in this case. The OIC does not seek to invade the attorney-client relationship existing between Mrs. Clinton, in her personal capacity, and Mr. Kendall, her personal lawyer. The privilege set up by the White House is strictly a governmental privilege, with the White House (or the Office of the President, alternatively) as client and Ms. Sherburne and Ms. Nemetz as attorneys. Accordingly, the White House is the real party in interest in this case, although Mrs. Clinton presents arguments similar to those of the White House in her capacity as an intervenor.

The discussion that follows can be summed up rather simply.  We need not decide whether a governmental attorney-client privilege exists in other contexts, for it is enough to conclude that even if it does, the White House may not use the privilege to withhold potentially relevant information from a federal grand jury.

**A.**

"[T]he privilege of a witness, person, government, State, or political subdivision thereof [is] governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."  Fed. R. Evid. 501.  We must therefore apply the federal common law of attorney-client privilege to the situation presented by this case.  See In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994).

The OIC and the White House have taken strikingly different rhetorical approaches to the question presented here.  The OIC argues that recognizing an attorney-client privilege in these circumstances would be tantamount to establishing a new privilege, which courts ordinarily undertake with great reluctance.  The White House, in contrast, argues that the attorney-client privilege is already the best-established of the common-law privileges and that, furthermore, it is an absolute privilege. The White House is correct, of course, in its assertion that the attorney-client privilege is the oldest known to the common law.  See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  But the lengthy roots of the privilege do not necessarily mean that it must apply in this dispute within the federal government, especially because the privilege has not previously been so applied.  Nor does the White House advance its case significantly by arguing that the attorney-client privilege is absolute, in the sense that it cannot be

overcome by a showing of need.  See, e.g., Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1493-94 (9th Cir. 1989).  This argument merely begs the true question, whether a governmental attorney-client privilege exists at all in the context of a federal criminal investigation.

We address this question by beginning with Proposed Federal Rule of Evidence 503, which we have described as "a useful starting place" for an examination of the federal common law of attorney-client privilege.  In re Bieter Co., 16 F.3d at 935.  As promulgated by the Supreme Court in 1972, Proposed Rule 503 would have defined "client" to include "a person, public officer, or corporation, association, or other organization or entity, either public or private."  Proposed Fed. R. Evid. 503(a)(1), reprinted in 56 F.R.D. 183, 235 (1972).  The commentary makes it clear that "[t]he definition of 'client' includes governmental bodies."  Id. advisory committee's note.  But neither the proposed rule nor the commentary has anything to say about the particular situation before us in this case; they represent only the broad proposition that a governmental body may be a client for purposes of the attorney-client privilege.[3]

---

[3]Judge Kopf's dissent relies too heavily, we believe, on the precise wording of Proposed Rule 503.  Although we have found the proposed rule accurate in other cases that have come before us, see In re Bieter Co., 16 F.3d at 935, it bears repeating that we are instructed by Rule 501 to interpret the attorney-client privilege "in light of reason and experience" and not solely in light of the rule promulgated by the Supreme Court in 1972.  Even the Court itself at times has interpreted privileges differently from the rules it proposed.  See Jaffee v. Redmond, 116 S. Ct. 1923, 1931 (1996) (concluding that psychotherapist-patient privilege encompasses communications to social workers, contrary to Proposed Rule 504); Trammel v. United States, 445 U.S. 40, 51-53 (1980) (recognizing marital privilege entirely different from Proposed Rule 505).

Other compilations of the general law have taken similar approaches. See Restatement (Third) of the Law Governing Lawyers § 124 (Proposed Final Draft No. 1, 1996) [hereinafter Restatement] ("[T]he attorney-client privilege extends to a communication of a governmental organization.");[4] Unif. R. Evid. 502(a)(1) (defining "client" in terms similar to Proposed Fed. R. Evid. 503). Each of these authorities, however, expresses at least some concern about applying the privilege broadly to governmental entities. Uniform Rule 502 limits the governmental privilege to situations involving a pending investigation or litigation and requires a finding by the court that disclosure will "seriously impair" the agency's pursuit of the investigation or litigation. See Unif. R. Evid. 502(d)(6).[5] Language in the Restatement addresses even more directly the concerns relevant in the instant case:

> More particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another. Such rules should take account of the complex considerations of governmental structure, tradition, and regulation that are involved.

Restatement § 124 cmt. b. We agree with this language from the Restatement and accordingly look to the case law for further guidance.

---

[4]The American Law Institute has approved the chapter of Proposed Final Draft No. 1 of the Restatement governing the attorney-client privilege and the work product doctrine. See 64 U.S.L.W. 2739 (May 28, 1996).

[5]The White House correctly points out that a number of the states adopting the Uniform Rules have omitted the limitation in Rule 502(d)(6). See, e.g., Neb. Rev. Stat. § 27-503(4) (1995). These omissions, however, prove no more than does the lack of specific language in Proposed Federal Rule 503.

The White House has located only two cases involving a clash between a grand jury and a claim of governmental attorney-client privilege. In In re Grand Jury Subpoenas Duces Tecum (Farber), 574 A.2d 449 (N.J. Super. Ct. App. Div. 1989), a New Jersey intermediate appellate court considered two subpoenas issued by a county grand jury to private lawyers who had been retained to represent a county agency. The court concluded that "the privilege is fully applicable to communications between a public body and an attorney retained to represent it," id. at 454, but reversed the lower court's order quashing the subpoenas because the attorneys should have been required to appear before the grand jury and invoke the privilege in response to specific questions, see id. at 458. In In re Grand Jury Subpoena (Doe), 886 F.2d 135 (6th Cir. 1989), the Sixth Circuit considered a subpoena issued by a federal grand jury to the city of Detroit. The court vacated the district court's finding that the city council was not the client of the city's corporation counsel but concluded that the application of the attorney-client privilege depended on the confidentiality of the communications, which in turn depended on the proper application of the state open-meetings law. See id. at 138. The court remanded the case to allow the district court to resolve that issue. See id. at 139.

For several reasons, we do not find these cases particularly persuasive. First, neither court actually applied a governmental attorney-client privilege to block a grand jury's investigation; both found it necessary to remand for further proceedings. We hesitate to ignore judicial pronouncements too readily as mere dicta, however, for we must find guidance somewhere in the parties' proffered authorities, none of which is directly in point. Several significant factual distinctions between the aforementioned cases and the case at bar are therefore also relevant. The New Jersey case involved the interaction between a county grand jury and a

county agency, a subject which is undoubtedly of considerable importance to the state of New Jersey but does not bear directly on the relationship of a federal grand jury to a federal entity. In addition, that case involved private attorneys hired as special counsel to the county agency, and the court recognized that the private lawyers were not subject to a state statute requiring all public employees to testify before any grand jury in exchange for use immunity. See In re Grand Jury (Farber), 574 A.2d at 455. It is, of course, impossible for us to determine how the New Jersey court would have harmonized this statute with the asserted governmental attorney-client privilege if the attorney involved had been a public employee. The Sixth Circuit case, involving a standoff between a federal grand jury and a city government, implicates potentially serious federalism concerns not present in the case before us. The court's brief opinion is also rather unpersuasive legally, as it contains no acknowledgment that to extend the privilege to a governmental body where individuals within the government are being scrutinized by a grand jury for criminal activity poses anything but a routine concern. (The court cited only two privilege cases, neither of which had anything to do with government lawyers.)

Moving somewhat further afield, the White House cites a number of cases in which courts have applied a governmental attorney-client privilege in civil actions. These cases, all of which involved either the sui generis jurisprudence of the Freedom of Information Act (5 U.S.C. § 552 (1994))[6] or a situation in which

---

[6]See Mead Data Cent., Inc. v. United States Dep't of Air Force, 566 F.2d 242, 252-53 (D.C. Cir. 1977); Covington & Burling v. Food & Nutrition Serv., 744 F. Supp. 314, 323 (D.D.C. 1990); Badran v. United States Dep't of Justice, 652 F. Supp. 1437, 1440 (N.D. Ill. 1987); Green v. IRS, 556 F. Supp. 79, 85-86 (N.D. Ind. 1982), aff'd, 734 F.2d 18 (7th Cir. 1984) (table); cf. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 154 (1975) (concluding that work product doctrine applies in FOIA cases); Wright v. OSHA, 822 F.2d 642, 648 (7th Cir. 1987) (holding that FOIA exemption for records compiled for law enforcement purposes incorporates attorney-client privilege); Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors, 69 Cal. Rptr. 480, 489 (Cal. Ct. App. 1968) (noting, in action under state public meeting act, that California cases have assumed that public

the party seeking information was a private litigant adversarial to the government,[7] are not particularly persuasive in the circumstances of this case.  Even if we were to conclude that the governmental attorney-client privilege ordinarily applies in civil litigation pitting the federal government against private parties, a question that we need not and do not decide, we believe the criminal context of the instant case, in which an entity of the federal government seeks to withhold information from a federal criminal investigation, presents a rather different issue.  See

---

agencies may assert privilege).  But cf. City of N. Miami v. Miami Herald Publ'g Co., 468 So. 2d 218, 220 (Fla. 1985) (ruling that state public records act does not exempt communications between attorneys and governmental clients, except during pendency of litigation); News & Observer Publ'g Co. v. Poole, 412 S.E.2d 7, 17 (N.C. 1992) (holding that state public records act exempts only written communications from attorney to governmental client, and only for three years).

[7]See Scott Paper Co. v. United States, 943 F. Supp. 489, 498-500 (E.D. Pa.) (Magistrate Judge) (dicta), aff'd, 943 F. Supp. 501 (E.D. Pa. 1996); Donovan v. Teamsters Union Local 25, 103 F.R.D. 550, 552-53 (D. Mass. 1984); SEC v. World-Wide Coin Investments, Ltd., 92 F.R.D. 65, 66-67 (N.D. Ga. 1981); Jupiter Painting Contracting Co. v. United States, 87 F.R.D. 593, 598 (E.D. Pa. 1980); Thill Sec. Corp. v. New York Stock Exch., 57 F.R.D. 133, 138-39 (E.D. Wis. 1972); Detroit Screwmatic Co. v. United States, 49 F.R.D. 77, 78 (S.D.N.Y. 1970); United States v. Anderson, 34 F.R.D. 518, 522-23 (D. Colo. 1963); cf. In re Allen, 106 F.3d 582, 600 n.8 (4th Cir. 1997) (noting that private party did not challenge applicability of privilege to government agency); Mitzner v. Sobol, 136 F.R.D. 359, 360-62 (S.D.N.Y. 1991) (suggesting that state agency may assert privilege) (dicta); Bruce v. Christian, 113 F.R.D. 554, 560 (S.D.N.Y. 1986) (holding that city agency may assert privilege); State ex rel. Babbitt v. Arnold, 548 P.2d 426, 428 (Ariz. Ct. App. 1976) (holding that county may assert privilege).

<u>Nixon</u>, 418 U.S. at 712 n.19 (suggesting that executive privilege may apply differently in criminal and civil cases); <u>Cervantes v. Time, Inc.</u>, 464 F.2d 986, 992-93 n.9 (8th Cir. 1972) (recognizing that reporter's privilege may apply differently in criminal and civil cases), <u>cert. denied</u>, 409 U.S. 1125 (1973); <u>Zerilli v. Smith</u>, 656 F.2d 705, 711-12 (D.C. Cir. 1981) (same).

Lacking persuasive direction in the case law, we turn to general principles.

> "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."

<u>United States v. Bryan</u>, 339 U.S. 323, 331 (1950) (quoting 8 J. Wigmore, <u>Evidence</u> § 2192 (3d ed. 1940)).  Privileges, as exceptions to the general rule, "are not lightly created nor expansively construed, for they are in derogation of the search for truth."  <u>Nixon</u>, 418 U.S. at 710.  It is appropriate to recognize a privilege "'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'"  <u>Trammel v. United States</u>, 445 U.S. 40, 50 (1980) (quoting <u>Elkins v. United States</u>, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

Federal common law recognizes a privilege only in rare situations.  <u>See</u>, <u>e.g.</u>, <u>Jaffee v. Redmond</u>, 116 S. Ct. 1923, 1931 (1996) (adopting psychotherapist-patient privilege); <u>University of Pa. v. EEOC</u>, 493 U.S. 182, 189 (1990) (rejecting academic peer

review privilege); <u>United States v. Arthur Young & Co.</u>, 465 U.S. 805, 817 (1984) (rejecting work product immunity for accountants); <u>Upjohn</u>, 449 U.S. at 390, 397 (assuming, and effectively deciding, that corporation may assert attorney-client privilege); <u>United States v. Gillock</u>, 445 U.S. 360, 373 (1980) (rejecting speech-or-debate privilege for state legislators); <u>Trammel</u>, 445 U.S. at 51-53 (rejecting privilege against adverse spousal testimony, but continuing to recognize privilege for confidential marital communications); <u>Nixon</u>, 418 U.S. at 705-13 (recognizing qualified executive privilege); <u>Couch v. United States</u>, 409 U.S. 322, 335 (1973) (rejecting accountant-client privilege); <u>Branzburg v. Hayes</u>, 408 U.S. 665, 690-91 (1972) (rejecting news reporter's privilege);[8] <u>In re Grand Jury (Virgin Islands)</u>, 103 F.3d 1140, 1146-47 (3d Cir. 1997) (rejecting, like eight other circuits, parent-child privilege); <u>Petersen v. Douglas County Bank & Trust Co.</u>, 967 F.2d 1186, 1188 (8th Cir. 1992) (rejecting insurer-insured confidentiality privilege); <u>United States v. Holmes</u>, 594 F.2d 1167, 1171 (8th Cir.) (rejecting probation officer-parolee privilege), <u>cert. denied</u>, 444 U.S. 873 (1979).

The White House does not dispute that a grand jury has broad investigatory powers.[9]  As the Supreme Court has recognized, the

---

[8]Some courts have interpreted <u>Branzburg</u> as establishing a qualified news reporter's privilege.  <u>See</u> <u>Shoen v. Shoen</u>, 5 F.3d 1289, 1292 & n.5 (9th Cir. 1993).  <u>But</u> <u>see</u> <u>In re Grand Jury Proceedings (Storer)</u>, 810 F.2d 580, 583-86 (6th Cir. 1987) (rejecting this theory).  Although the Ninth Circuit in <u>Shoen</u> cited our opinion in <u>Cervantes</u> for support, we believe this question is an open one in this Circuit.

[9]The White House does suggest that the OIC has not shown a "demonstrated, specific need" for the materials subpoenaed by the grand jury, citing <u>Nixon</u>, 418 U.S. at 713.  We doubt that this language from <u>Nixon</u> constitutes the proper need threshold even on the facts of that case, as it appears in a general discussion, rather than in the Court's specific analysis of Fed. R. Crim. P. 17(c).  <u>See</u> <u>id.</u> at 700.  In a grand jury case, the burden is on the subpoenaed party to demonstrate "that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation."  <u>United States v. R. Enters., Inc.</u>, 498 U.S. 292, 301 (1991); <u>see</u> <u>also</u> <u>In re Grand Jury Proceedings (Cheetham)</u>, 791 F.2d 663, 665-66 (8th Cir. 1986) (recognizing

principle that the public is entitled to "every man's evidence" is "particularly applicable to grand jury proceedings." Branzburg, 408 U.S. at 688. "[O]ur historic commitment to the rule of law," and particularly to the twin goals of criminal justice "'that guilt shall not escape or innocence suffer,'" are strong factors weighing against the applicability of a privilege. Nixon, 418 U.S. at 708-09 (citation omitted).

In essence, the parties' arguments center on two cases, neither of which is directly analogous to this case, but each of which has relevance to our decision: Nixon and Upjohn. In Nixon, a special prosecutor directed a subpoena duces tecum to President Nixon, seeking tapes and other materials for use in the criminal trial of seven defendants, including former White House officials. The President refused to comply with the subpoena, claiming executive privilege. After concluding that the special prosecutor had made the showing required by Federal Rule of Criminal Procedure 17(c) for a trial subpoena, see id. at 700, the Supreme Court considered the President's claim of privilege. The Court recognized that the need for confidential presidential communication "can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties," id. at 705, and that the privilege for presidential communications "is fundamental to the operation of Government and inextricably rooted

---

that no showing of need for information is required). The White House's own descriptions of the notes at issue in this case are sufficient to demonstrate their relevance to the OIC's investigation.

in the separation of powers under the Constitution," id. at 708. Despite the strong constitutional foundations of the privilege, however, the Court concluded that it had to give way to the special prosecutor's subpoena:

> A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

Id. at 712-13.

The OIC argues that under the logic of Nixon, the White House's claim of privilege must give way here, for if the governmental attorney-client privilege exists at all, it is certainly not constitutionally based. It is true, as the White House responds, that the President did not assert an attorney-client privilege in Nixon, and so the case is not directly controlling. We agree with the OIC, however, that Nixon is indicative of the general principle that the government's need for confidentiality may be subordinated to the needs of the government's own criminal justice processes.

The White House counters by pointing out that Nixon itself recognized the importance of common-law privileges, including the attorney-client privilege. See id. at 709-10. No one, the White House argues, would suppose that the special prosecutor could compel the production of notes made by a private lawyer concerning a conversation with a private client about even the most routine

traffic ticket.  Why then, the argument continues, should the benefit of this important privilege not be available to the White House?

Our discussion of the White House's primary argument, revolving around Upjohn, should demonstrate why we believe the private-attorney analogy is inapposite.  The White House proffers Upjohn as emblematic of the wide sweep of the attorney-client privilege, and we agree with that characterization, to a point.  In Upjohn, the IRS attempted to subpoena records of an internal investigation conducted by Upjohn's general counsel. The court of appeals rejected Upjohn's claim of privilege to the extent that the communications at issue involved lower-level employees outside the so-called "control group."  The Supreme Court rejected the "control group" test as unnecessarily restrictive, recognizing that if the attorney-client privilege is to have any value, it must encompass communications between attorneys and lower-level employees possessing relevant information:

> In the case of the individual client the provider of information and the person who acts on the lawyer's advice are one and the same.  In the corporate context, however, it will frequently be employees beyond the control group as defined by the court below--'officers and agents . . . responsible for directing [the company's] actions in response to legal advice'--who will possess the information needed by the corporation's lawyers.  Middle-level--and indeed lower-level--employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

Upjohn, 449 U.S. at 391 (alterations by Supreme Court).  The Court did not specify the precise extent of the privilege but specifically rejected the "control group" test.  Id. at 396-97.

-16-

As the White House points out, <u>Upjohn</u> contains strong language about the importance of the attorney-client privilege in encouraging the full and frank presentation of legal advice to corporations, which helps to insure that corporations will act within the law. <u>See</u> <u>id.</u> at 389, 392. And the Court recognized that "if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." <u>Id.</u> at 393. Nevertheless, we believe that important differences between the government and nongovernmental organizations such as business corporations weigh against the application of the principles of <u>Upjohn</u> in this case. First, the actions of White House personnel, whatever their capacity, cannot expose the White House as an entity to criminal liability. (No one suggests that any of the conduct under investigation by the OIC could expose the White House to civil liability.) A corporation, in contrast, may be subject to both civil and criminal liability for the actions of its agents, and corporate attorneys therefore have a compelling interest in ferreting out any misconduct by employees. The White House simply has no such interest with respect to the actions of Mrs. Clinton.

We also find it significant that executive branch employees, including attorneys, are under a statutory duty to report criminal wrongdoing by other employees to the Attorney General. <u>See</u> 28 U.S.C. § 535(b) (1994). Even more importantly, however, the general duty of public service calls upon government employees and agencies to favor disclosure over concealment. The difference between the public interest and the private interest is perhaps, by itself, reason enough to find <u>Upjohn</u> unpersuasive in this case. The importance of the public interest in questions of disclosure versus privilege is not unique to this case, for it was a key

-17-

reason the Supreme Court rejected the concept of work product immunity for accountants:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a <u>public</u> responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

<u>Arthur Young</u>, 465 U.S. at 817-18. The public responsibilities of the White House are, of course, far greater than those of a private accountant performing a service with public implications. We believe the strong public interest in honest government and in exposing wrongdoing by public officials would be ill-served by recognition of a governmental attorney-client privilege applicable in criminal proceedings inquiring into the actions of public officials. We also believe that to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets. <u>See</u> <u>also</u> <u>Jupiter Painting</u>, 87 F.R.D. at 598 (recognizing the "pernicious potential" of a governmental attorney-client privilege "in a government top-heavy with lawyers").[10]

---

[10]Judge Kopf cites several opinions of the Office of Legal Counsel for support. <u>See</u> <u>post</u> at 41-45. We find each of these opinions unpersuasive in the context of this case. Theodore Olson's 1982 opinion concerning the confidentiality of communications between the President and the Attorney General relies significantly on Freedom of Information Act cases and <u>Upjohn</u>, which we believe are not helpful to the White House in this case, and does not purport to address the viability of the privilege in the face of a grand jury subpoena. <u>See</u> <u>Memorandum for the Attorney General re: Confidentiality of the Attorney General's Communications in Counseling the President</u>, 6 Op. Off. Legal Counsel 481, 490-97 (1982). Each of the other opinions

We recognize the White House's concern that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." Upjohn, 449 U.S. at 393. Our first response is that the White House assumes that the attorney-client privilege is more predictable ex ante than it actually is. A client discussing an issue with a lawyer cannot know, for example, whether a bankruptcy trustee will later waive the privilege, see Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 358 (1985), or whether the lawyer's assistance will later become an issue in a proceeding, see Restatement § 130(1), or whether the lawyer and client will later become involved in a dispute, see Restatement § 133, any of which may result in disclosure of the conversation. Even so, we believe our holding in this case does not make the duties of government attorneys significantly more difficult. Assuming arguendo that there is a governmental attorney-client privilege in other circumstances, confidentiality will suffer only in those situations that a grand jury might later see fit to investigate. Because agencies and entities of the government are not themselves subject to criminal liability, a government attorney is free to discuss anything with a government official--except for

---

cited by the White House involves a government attorney representing a government official sued in his or her individual capacity in a Bivens action. In such a case, the government attorney enters into a personal attorney-client relationship with the individual defendant, and the usual privilege applies. See 28 C.F.R. § 50.15(a)(3) (1996). No such personal attorney-client relationship exists between Mrs. Clinton and the White House attorneys.

potential criminal wrongdoing by that official--without fearing later revelation of the conversation.  An official who fears he or she may have violated the criminal law and wishes to speak with an attorney in confidence should speak with a private attorney, not a government attorney.

Nor do we foresee any likely effect of our decision on the ability of a government lawyer to advise an official who is contemplating a future course of conduct.  If the attorney explains the law accurately and the official follows that advice, no harm can come from later disclosure of the advice, which would be unlikely anyway.  Like the Nixon Court, "we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution."  Nixon, 418 U.S. at 712.  The White House's "chilling effect" argument is no more persuasive in this case than it was in Nixon.

**B.**

Before we can conclude that the White House may not use the attorney-client privilege to thwart the grand jury's subpoena, we must consider the assertion, made by both the White House and Mrs. Clinton, that the presence of Mr. Kendall, Mrs. Clinton's private attorney, during her meetings with the White House attorneys affects the calculus in this case.  We disagree.

The White House and Mrs. Clinton rely on the common-interest doctrine, which expands the coverage of the attorney-client privilege in certain situations:

> If two or more clients with a common interest in a litigated or non-litigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged . . . that relates to the matter is privileged as against third persons. Any such client may invoke the privilege, unless it has been waived by the client who made the communication.

Restatement § 126(1); see also Proposed Fed. R. Evid. 503(b)(3), 56 F.R.D. at 236. This doctrine softens the ordinary requirement that lawyer-client communications must be made in confidence in order to be protected by the privilege. See Restatement § 121; John Morrell & Co. v. Local Union 304A, United Food & Commercial Workers, 913 F.2d 544, 555-56 (8th Cir. 1990) (applying the doctrine), cert. denied, 500 U.S. 905 (1991).

One possible interpretation of the meetings at issue here is that they involved Mrs. Clinton in her personal capacity, her personal attorney, Mrs. Clinton as a representative of the White House (which we assume for the sake of argument would put her there in an official capacity), and the White House's official attorneys, in a type of four-sided conference. We will assume this scenario as a factual framework for the possible application of the common-interest doctrine. We conclude that the doctrine is inapplicable, for two distinct reasons.

First, as our discussion in Part III-A, supra, demonstrates, the White House's assumption that communications made by Mrs. Clinton to Ms. Sherburne and Ms. Nemetz "otherwise qualif[y] as privileged," Restatement § 126(1), begs the question we are called upon to decide. In addition, there is lacking in this situation the requisite common interest between the clients, who are Mrs. Clinton in her personal capacity and the White House. Mrs. Clinton's interest in the OIC's investigation is, naturally,

-21-

avoiding prosecution, or else minimizing the consequences if the OIC decides to pursue charges against her.  One searches in vain for any interest of the White House which corresponds to Mrs. Clinton's personal interest.  The common interest may be "either legal, factual, or strategic in character," id. cmt. e, but no legitimate interest offered by the White House meets even this loose standard.  Most of the interests put forward by the White House are summed up in this excerpt from its brief:

> Both [the White House and Mrs. Clinton] needed a full and accurate understanding of the facts surrounding the various incidents under investigation and of the legal consequences of those facts; both had an interest in ensuring that there was no distortion of these events by political and legal adversaries, and no misunderstanding of them by the public.

Br. of White House at 27.  In addition, the White House and Mrs. Clinton cite the need for allocation of responsibility between personal and public attorneys, the desire to determine whether any White House policies need to be altered to prevent future difficulties, the fact that the OIC is investigating "official misconduct," and the ongoing Whitewater-related investigations by the RTC, FDIC, and Congress as factors creating a common interest between them.

We have no doubt that the White House and Mrs. Clinton are concerned with understanding fully the facts involved in the OIC's investigation, nor that dividing responsibility between the personal attorneys and White House counsel can be a difficult task.  And surely the multiplicity of investigating authorities only complicates the lives of these attorneys.  But these justifications amount to no more than an assertion that "we all want to obey the law."  We do not believe the common-interest doctrine stretches that far.

As for the suggestion that the OIC is investigating "official misconduct," thus triggering the interest of the White House, we believe there is a difference between "official misconduct"--whatever that may be-- and "misconduct of officials."  The OIC is actually investigating the actions of individuals, some of whom hold positions in the White House. The OIC's investigation can have no legal, factual, or even strategic effect on the White House as an institution.  Certainly action by the OIC may occupy the time of White House staff members, may vacate positions in the White House if any of its personnel are indicted, and may harm the President and Mrs. Clinton politically.  But even if we assume that it is proper for the White House to press political concerns upon us, we do not believe that any of these incidental effects on the White House are sufficient to place that governmental institution in the same canoe as Mrs. Clinton, whose personal liberty is potentially at stake.

The White House argues that it must be permitted to invoke the attorney-client privilege "'not for the benefit of the President as an individual, but for the benefit of the Republic.'"  Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting the Solicitor General's brief filed in that case).  Because, however, the White House and Mrs. Clinton have failed to establish that the interests of the Republic coincide with her personal interests, the attempt must fail.

## c.

We next confront the conclusion of the District Court that Mrs. Clinton's reasonable belief that her conversations with White House lawyers were privileged is sufficient to prevent their disclosure.  Because we conclude that this issue is irrelevant to

the inquiry at hand, we need not examine whether Mrs. Clinton's belief was reasonable.

In some aspects of the law of attorney-client privilege, the client's reasonable beliefs may be relevant. For example, courts have found the privilege applicable where the client reasonably believed that a poseur was in fact a lawyer,[11] reasonably believed that a lawyer represented the client rather than another party,[12] or reasonably believed that a conversation with a lawyer was confidential, in the sense that its substance would not be overheard by or reported to anyone else.[13] All these situations involve, in essence, reasonable mistakes of fact, none of which is applicable here. Because Mrs. Clinton does not claim that she believed that the White House lawyers represented her personally, her argument must be that she believed that the law sweeps broadly enough to cloak these conversations within the attorney-client privilege.[14] But we know of no authority, and Mrs. Clinton has

---

[11]See United States v. Mullen & Co., 776 F. Supp. 620, 621 (D. Mass. 1991) (dicta); United States v. Tyler, 745 F. Supp. 423, 425-26 (W.D. Mich. 1990); United States v. Boffa, 513 F. Supp. 517, 523 (D. Del. 1981) (dicta). See generally Restatement § 122(1).

[12]See United States v. Hart, No. Crim. A. 92-219, 1992 WL 348425, at *1-2 (E.D. La. Nov. 6, 1992); cf. Wylie v. Marley Co., 891 F.2d 1463, 1471-72 (10th Cir. 1989) (finding no abuse of discretion in district court's application of privilege where relationship of employee to employer's attorney was confusing).

[13]See United States v. Moscony, 927 F.2d 742, 752 (3d Cir.), cert. denied, 501 U.S. 1211 (1991); Griffith v. Davis, 161 F.R.D. 687, 694-95 (C.D. Cal. 1995). See generally Restatement § 121.

[14]Mrs. Clinton bases her argument in part on the confidentiality obligations of attorneys licensed in the District of Columbia. See D.C. Rules of Professional Conduct Rule 1.6 (1996). The commentary to that very rule, however, states that it is not intended to govern the scope of the attorney-client privilege, see id. cmt. 5, and we have previously held that ethical rules do not alter the privilege. See United States v. Sindel, 53 F.3d 874, 877 (8th Cir. 1995).

cited none, holding that a client's beliefs, subjective or objective, about the law of privilege can transform an otherwise unprivileged conversation into a privileged one.

As the OIC notes, only rarely does the law take account of an actor's beliefs about the law at the time he or she took action: the doctrine of qualified immunity, the non-applicability of new rules of constitutional law to federal habeas petitions brought by state prisoners, and the good-faith exception to the warrant requirement are perhaps the best examples. Without delving into the policy reasons behind these exceptional legal doctrines, we are satisfied that there is no compelling reason that a reasonable-mistake-of-law rule should apply in the realm of privileges. See Trammel, 445 U.S. at 53 (overruling earlier case that had upheld privilege against adverse spousal testimony and affirming defendant's conviction, despite possible reliance on prior law).

## D.

For the reasons stated, we conclude that the White House may not use the attorney-client privilege to avoid complying with the subpoena issued in this case by a federal grand jury calling for the notes in question of Ms. Nemetz and Ms. Sherburne.

## IV.

The District Court held that the work product doctrine also applied in this case to protect the White House attorneys' notes from disclosure. We disagree.

The work product doctrine sharply limits the access of an opponent to materials "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3); see also Hickman v. Taylor, 329 U.S. 495, 511 (1947) ("materials obtained or prepared by an adversary's counsel with an eye toward litigation"); Restatement § 136(1) (material "prepared by a lawyer for litigation then in progress or in reasonable anticipation of future litigation"). The White House's claim of work product immunity founders on the "anticipation of litigation" requirement of the doctrine.

Courts have applied work product immunity in a variety of legal contexts. See Hickman, 329 U.S. at 513-14 (civil case); United States v. Nobles, 422 U.S. 225, 238 (1975) (criminal case); In re Grand Jury Proceedings (Duffy), 473 F.2d 840, 846-47 (8th Cir. 1973) (grand jury investigation). The essential element of each case, however, is that the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client.[15] The White House's argument that its lawyers were preparing for the OIC's investigation is simply unpersuasive; as we have stated previously, the OIC is not investigating the White House, nor could it do so. White House officials may be under investigation on account of their individual acts, but we know of no authority allowing a client such as the White House to claim work product immunity for materials merely because they were prepared while some other person, such as Mrs. Clinton, was anticipating litigation.[16] Cf. In re California Pub. Utils. Comm'n,

---

[15]Work product immunity may be asserted by either the client or the attorney. See, e.g., In re Sealed Case, 676 F.2d 793, 809 & n.56 (D.C. Cir. 1982).

[16]Even if there is a common-interest work product doctrine, see United States v. American Tel. & Tel. Co., 642 F.2d 1285, 1299-1300 (D.C. Cir. 1980), our earlier holding that the White House and Mrs. Clinton share no relevant common interest makes the doctrine inapplicable here.

892 F.2d 778, 781 (9th Cir. 1989) (concluding that non-party to litigation may not assert work product doctrine).

As a fall-back position, the White House suggests that anticipated congressional hearings will suffice as well as anticipated litigation. The Restatement seems to agree with the White House. See Restatement § 136 cmt. h (stating that litigation "includes a proceeding such as a grand jury or a coroner's inquiry or an investigative legislative hearing"). Neither the White House, Mrs. Clinton, nor the Restatement cites any authority for this proposition, however, and we have discovered none. Cf. P. & B. Marina, L.P. v. Logrande, 136 F.R.D. 50, 58-59 (E.D.N.Y. 1991) (finding letters from lobbyist to client not protected work product), aff'd, 983 F.2d 1047 (2d Cir. 1992) (table). Even if it could be said that the White House anticipated a congressional investigation of the White House itself, rather than merely of individuals who work at the White House, and even if we consider a congressional investigation to be an adversarial proceeding, the only harm that could come to the White House as a result of such an investigation is political harm. As in our discussion of the common-interest doctrine, we decline to endorse the position of the White House where it is based on nothing more than political concerns.

The White House bears the burden of establishing the elements of work product immunity. See Restatement § 139(2). Based on the showing the White House has made here, we cannot conclude that the work product of its attorneys may be kept from the OIC.

**V.**

At oral argument, we raised sua sponte the possibility that we could decide the questions of law presented in this appeal without necessarily applying them to this case. After further consideration, we have concluded that our decision must be applied to the parties now before us.

In Harper v. Virginia Dep't of Taxation, 509 U.S. 86 (1993), the Supreme Court settled one major question of the retroactivity of decisions:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. . . . In both civil and criminal cases, we can scarcely permit 'the substantive law to shift and spring' according to 'the particular equities of individual parties' claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule.

Id. at 97 (citation and alterations omitted); see also Griffith v. Kentucky, 479 U.S. 314, 322-23 (1987) (adopting same rule for criminal cases).

The Court's recent decisions have not forced it to contend with the permissibility of "pure prospectivity," that is, the practice of announcing a new rule but applying it neither to the parties involved in the watershed case nor to others similarly situated. The Court has on occasion resorted to purely prospective decisionmaking, see James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 536 (1991) (opinion of Souter, J.) (citing cases), but language in the Court's recent opinions convinces us that purely

prospective adjudication is at least unwise and most likely beyond our power.  See Harper, 509 U.S. at 97 (citing "'basic norms of constitutional adjudication'" (quoting Griffith, 479 U.S. at 322)); id. at 106 (Scalia, J., concurring) ("prospective decisionmaking is quite incompatible with the judicial power").

The most relevant precedent also suggests that it is appropriate to apply our decision in this case.  In Trammel, the Supreme Court considered the well-established common law privilege against adverse spousal testimony.  See Trammel, 445 U.S. at 43-46 (describing history of privilege).  The Court had specifically affirmed the vitality of the privilege in Hawkins v. United States, 358 U.S. 74, 77-79 (1958), and the Proposed Rules of Evidence had recommended continuation of the privilege. See Proposed Fed. R. Evid. 505(a), 56 F.R.D. at 244.  Nevertheless, the district court permitted Trammel's wife to testify against him over his objection, and the court of appeals affirmed his conviction.  See Trammel, 445 U.S. at 42-43.  The Supreme Court, by a unanimous vote, took the privilege away from the defendant-spouse, leaving it to the witness-spouse to decide whether to testify.  See id. at 53.  Despite this clear overruling of its earlier precedent, the Court applied the new rule to Trammel's case and affirmed his conviction.  We believe the same treatment is appropriate in this case, which involves no such drastic change in the law; in fact, because this is a case of first impression, our decision involves no change in the law at all.

In short, a purely prospective decision is little more--perhaps nothing more--than an advisory opinion.  We decline to render such an opinion and conclude that our holding necessarily applies to the White House in this case.

## VI.

To sum up, we hold that neither the attorney-client privilege nor the attorney work product doctrine is available to the White House in the circumstances of this case. Accordingly, the order of the District Court is reversed, and the case is remanded for the entry of an order granting the OIC's motion to compel.

KOPF, District Judge, dissenting.

## I. Introduction

I respectfully dissent. This case involves the institutional capacity of the President of the United States to function with the advice of legal counsel. The clarity of this point is made evident by the subpoena, which demands notes taken by "the Office of Counsel to the President." (Subpoena Rider at 1.) Because of this important fact, I would apply United States v. Nixon, 418 U.S. 683 (1974), rather than the position urged by the Independent Counsel (IC). I would not follow Nixon for some purposes, and disregard it for others.

Federal Rule of Evidence 501 requires that we decide whether federal common law extends the attorney-client privilege to the White House. The White House possesses an attorney-client privilege under proposed Federal Rule of Evidence 503, sometimes called Supreme Court Standard 503 (Rule 503). Rule 503 accurately states the federal common law regarding the attorney-client privilege, as this court has consistently stated in the past. The following portion of Rule 503 is pertinent to the dispute here:

(a) Definitions.  As used in this rule:

(1) A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.

(2) A "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.

(3) A "representative of the lawyer" is one employed to assist the lawyer in the rendition of professional legal services.

(4) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(b) General rule of privilege.  A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Rule 503, reprinted in 56 F.R.D. 183, 235-36 (1972).

I disagree with the IC that the Rule does not mean what it states, and we should act as if it did not exist.  There is no reason to deny the well-recognized principle that the government, including the White House, is legitimately entitled to the attorney-client privilege (and the work-product doctrine).  The

White House, no less than a state government or a corporation, is entitled to the privilege in all types of cases, including criminal cases, so that the White House can comply with the law. The privilege advances the public interest by assuring that the White House will receive well-founded, fact-specific legal advice based upon candid responses from White House officials. Accordingly, I disagree with the IC's position that the White House lacks the attorney-client privilege.

However, the Supreme Court's decision in Nixon persuades me that the White House privilege gives way to a grand jury subpoena duces tecum issued under the direction of the IC provided the procedural protections of Nixon have been observed. Unlike the IC, I believe Nixon overcomes, but does not erase, the privilege. Nixon requires us to conclude that the President's general need for confidentiality, expressed here by the attorney-client privilege, is overshadowed by the grand jury's general need for evidence of the truth. Still, Nixon does not, as the IC urges and the majority finds, permit us to assume that the White House lacks the privilege in the first instance.

In particular, I would require, as Nixon did in the context of a trial subpoena, that before documents are revealed to the grand jury:

>  (1) the special prosecutor must make an initial threshold showing before the district court that the documents are: (a) specifically needed; (b) relevant; and (c) admissible;

>  (2) assuming such a showing has been made, the documents are first delivered to the district judge, who will examine the documents in chambers, to decide if in fact the documents are relevant and admissible, and irrelevant documents will be returned under seal to the White House.

-32-

Id. at 700-02, 713-16.

I do not agree that a grand jury subpoena directed at the White House is *more* important than the trial subpoena directed at the White House in Nixon. The President's justifiable need for confidentiality is, as Nixon recognized, ever present no matter what other governmental interests are asserted by a prosecutor. The public purpose served by a grand jury is no more important than the public purpose served by a criminal trial. Thus, I disagree with the court's failure to require the IC to make the same type of showing on a motion to compel a response to a grand jury subpoena directed at the White House as would be required by Nixon for a trial subpoena.

Furthermore, because Mrs. Clinton also has an attorney-client privilege in her personal capacity, her privilege, implemented in this case by the "common interest" part of the rule, should be considered a complete defense to the grand jury subpoena issued to the White House. I have two reasons for this belief: (1) unlike the White House, Mrs. Clinton has various constitutional rights that are implicated by intercepting her privileged communications without warning and then revealing those communications to a prosecutor; and (2) Nixon did not attempt to balance the "public interest" against the "individual interest" and thus cannot serve as precedent for the dispute between the IC and Mrs. Clinton in her personal capacity.

Finally, because we should now declare for the first time that Nixon overcomes the White House privilege if a proper showing is made, Mrs. Clinton would consult with White House lawyers at her peril in the future. She would be informed from our opinion that such consultations might no longer be protected since the other

-33-

party to her conversations (the White House and its lawyers) could be obligated to respond to a grand jury subpoena if the prosecutor made the showing required by Nixon.  Consequently, in the future, and to the extent of a grand jury subpoena, any such communications could not legally be "intended" by Mrs. Clinton as "confidential" under Rule 503(a)(4) because she would know and understand that her communications could be "disclosed to third persons."

Accordingly, I would affirm the district court's properly cautious decision refusing to enforce the subpoena.  Yet I would make it clear that the White House attorney-client privilege gives way to a grand jury subpoena issued under the supervision of the IC if the procedural protections afforded the White House by Nixon are satisfied.  A detailed explanation of these views is set forth below.

## II.  The White House

Like any other client, the White House has an attorney-client privilege in all types of cases.  The question, and it is a very difficult one, is whether that privilege should prevail in this first-of-a-kind case. Subject to certain procedural protections, fidelity to Nixon requires that the White House privilege give way to the limited extent of a subpoena duces tecum issued by a federal grand jury acting at the direction of the IC.  We should not, however, act as if the White House lacks the privilege or allow the IC to make an end run around the procedural protections afforded the White House by Nixon.

-34-

### A.  The White House and the Attorney-Client Privilege

We must ask two questions when determining whether the White House has an attorney-client privilege:  (1) what standard applies and (2) has the White House satisfied that standard?

### 1.  The Common Law and Rule 503

Federal Rule of Evidence 501 provides that "the privilege of a . . . person" or "government" "shall be governed by principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."  It is our task to find the common law of attorney-client privilege.

Promulgated by the Supreme Court in November 1972, Rule 503(a)(1) plainly grants the White House the attorney-client privilege.  The rule extends the privilege to "organization[s] or entit[ies], either public or private."

The subpoena was directed to the "White House."  Thus, the IC recognized the "White House" as a discrete governmental organization or entity protected by the unambiguous language of Rule 503(a)(1).  Consequently, if Rule 503 applies, the White House has the privilege it asserts.

To avoid Rule 503, it is argued that the rule does not apply because (1) Congress did not enact it;  (2) it does not apply to criminal cases involving governmental entities; (3) the public interest is not served when a governmental entity asserts the privilege.  None of these arguments suggest a valid reason for failing to follow the plain words of the Rule.

## a. Rule 503 Reflects the Common Law Despite Congressional Action

Congress did not enact Rule 503 and various other privilege rules. Instead, Congress adopted a general rule (Rule 501) allowing the federal courts to establish privilege in light of the common law. See Jaffee v. Redmond, 116 S. Ct 1923, 1927 n.7, 1930 (1996) (citing proposed Rule 504 regarding psychotherapist-patient privilege in support of the Court's adoption, under Rule 501, of such a privilege).

Our precedents correctly state, however, that Rule 503 is "'an accurate definition of the federal common law of attorney-client privilege.'" In Re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994) (quoting 2 Jack B. Weinstein et al., Weinstein's Evidence ¶ 503[02], at 503-17 (1975)) (applying rule and finding the privilege applied to partnership and prevented disclosure of communication between a consultant of partnership and attorney); United States v. Spector, 793 F.2d 932, 938 (8th Cir. 1986), cert. denied, 479 U.S. 1031 (1987) (stating "courts have relied upon [Rule 503] as an accurate definition of the federal common law of attorney-client privilege" and affirming order quashing subpoena for taped statements made by client at direction of a lawyer); Citibank, N.A. v. Andros, 666 F.2d 1192, 1195 n.6 (8th Cir. 1981) (stating rule is "a source for defining the federal common law of attorney-client privilege" and holding that privilege belonged to trustee of a corporation and could be waived by him).

Other circuits have come to the same conclusion. See, e.g., Tennenbaum v. Deloitte & Touche, 77 F.3d 337, 340 (9th Cir. 1996) (the court would look to Rule 503 since the proposed rule, although not adopted, was a convenient comprehensive guide to existing federal law of privilege) (citations omitted); United States v.

Moscony, 927 F.2d 742, 751 (3rd Cir.), <u>cert. denied</u>, 501 U.S. 1211 (1991) (Supreme Court Standard 503, though not promulgated, is a restatement of the common law of attorney-client privilege applied in the federal courts before the adoption of the federal rules) (citations omitted); <u>United States v. (Under Seal)</u>, 748 F.2d 871, 874 n. 5 (4th Cir. 1984) (Rule 503 provides a comprehensive guide to the federal common law of attorney-client privilege) (citations omitted).

Importantly, the Supreme Court proposed the Rule. This court, and others, frequently refers to the Rule as "Supreme Court Standard 503." <u>See, e.g.</u>, <u>In Re Bieter Co.</u>, 16 F.3d at 935; <u>United States v. Spector</u>, 793 F.2d at 938. When searching for the common law, we should not disregard the fact that the Supreme Court approved the Rule.

Distinguished commentators have also reached the same conclusion: "Standard 503 is a restatement of the traditional common law attorney-client privilege that had been applied in the federal courts prior to the adoption of the federal rules. Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the courts." 2 Jack B. Weinstein et al., <u>Weinstein's Evidence</u> ¶ 503[02], at 503-19 (1996) (citing, among other cases, <u>Diversified Indus., Inc. v. Meredith</u>, 572 F.2d 596, 605 n.1 (8th Cir. 1977)) (footnotes omitted). <u>See also</u> <u>Restatement of the Law (Third) Governing Lawyers</u> § 124 & Rep.'s n. at 412 (Proposed Official Draft 1996),[1] <u>available in</u> WL database "REST-LGOV" (citing Rule 503(a)(1)

---

[1]This draft received tentative approval in May, 1996. <u>American Law Institute Nears Finish Line on Lawyer Ethics, Product Liability Projects</u>, 64 U.S.L.W. 2739 (May 28, 1996).

as support for the proposition that the "prevailing rule" is that the government has the same privilege as its private counterparts).

Therefore, the failure of Congress to adopt Rule 503 is not significant. The Rule is an accurate definition of the federal common law of attorney-client privilege despite the lack of Congressional approval.

### b. Rule 503 Makes No Distinction for Criminal Cases

Contrary to the second argument for not applying it, the plain words of Rule 503 make no distinction for criminal cases. I find no reason to make an exception for special prosecutors who have a dispute with the White House.

To the extent it is suggested that the privilege has never been extended to a federal governmental entity in a criminal case brought by another federal governmental entity, the point is meaningless. The reason there are no such cases is obvious: intra-governmental disputes in the federal criminal arena seldom arise, regardless of whether the attorney-client privilege is involved.

Further, there is certainly no case which denies the privilege in matters such as this. In fact, the only remotely relevant federal case implicitly acknowledged the existence of the privilege for a state governmental entity in a federal criminal investigation. In Re Grand Jury Subpoena, 886 F.2d 135, 137-38 (6th Cir. 1989) ("city council" was a "client" for the purpose of attorney-client privilege when a federal grand jury sought documents from the City of Detroit and the city asserted the privilege).

Most importantly, there is no reason to pretend the privilege does not exist simply because the White House asserts it during a criminal investigation. As will be discussed in more detail later, <u>Nixon</u> did not take this approach. Rather, as the <u>Nixon</u> court made clear, the appropriate approach is to balance the governmental privilege asserted by the White House (whether it be the attorney-client privilege or some other privilege) against the competing governmental interest asserted by the IC, the ultimate goal being to promote the "public interest." 418 U.S. at 707-13.

Consequently, I reject the argument that it is proper to ignore the attorney-client privilege because the IC has the power to attach the label "criminal" to this dispute.

### c. A White House Privilege Promotes the Public Interest

Recognition of the privilege for governmental entities, particularly the White House, advances the public interest.

Since Rule 503 was proposed, the federal courts have consistently recognized that governmental entities have the attorney-client privilege. <u>See, e.g.</u>, <u>Mead Data Cent., Inc. v. United States Dep't of Air Force</u>, 566 F.2d 242, 252-53 & n.20 (D.C. Cir. 1977) (recognizing privilege in Freedom Of Information Act (FOIA) case and stating that in other contexts "there are decisions which have applied [the privilege] to deny a discovery request directed toward a government") (citations omitted); <u>Jupiter Painting Contracting Co. v. United States</u>, 87 F.R.D. 593, 598 & n.6 (E.D. Pa. 1980) (recognizing privilege in a suit for a tax refund and stating that "[c]ourts generally have accepted that attorney-client privilege applies in governmental context") (collecting federal cases dating from and after 1963) (citations omitted).

While it is true that none of these cases dealt with the precise issue in this case, one cannot ignore the fact that the courts have consistently held that the public interest is furthered by extending the privilege to governmental entities. As a result, we should be very skeptical of the IC's argument that requires us to ignore a general principle.

Since at least 1965, Congress has affirmatively recognized the government's need to be protected by the attorney-client privilege regarding the production of documents. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 136, 154 (1975) (applying 5 U.S.C. § 552(b)(5)) (FOIA case). The Court observed that the legislative history, authored in 1965, declared the exemption "'would include . . . documents which would come within the attorney-client privilege if applied to private parties.'" Id. (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)). Consequently, believing that Congress would find recognition of the privilege to be a surprise is impossible.

The proposed Restatement of the Law (Third) Governing Lawyers also recognizes that the attorney-client privilege "extends to a communication of a governmental organization" and to "an individual officer, employee, or other agent of a governmental organization . . . ." Restatement of the Law (Third) Governing Lawyers § 124, at 408. This section "states the generally prevailing rule that governmental agencies and agents enjoy the same privilege as non-governmental counterparts." Id. cmt. b at 409 & Rep.'s n. at 412-14 (collecting federal and state cases dating from and after 1942) (citations omitted) (emphasis added). The rationale is obvious: "The privilege aids government entities and officers in obtaining legal advice founded on a complete and accurate factual picture. Communications from such agents should be correspondingly privileged." Id. at 408. The Restatement's reasoned conclusion,

coming nearly twenty-five years after the Supreme Court proposed Rule 503, lends added support for the finding that a governmental attorney-client privilege advances, rather than detracts from, the public interest.[2]

Although the IC now holds the opposite view, the United States has previously and consistently taken the position that governmental entities, particularly the President and his advisers, are protected by the attorney-client privilege. One prior expression of the views of the United States regarding the attorney-client privilege, the President, and his advisers is particularly thoughtful.

In a 1982 opinion issued to the Attorney General of the United States, Assistant Attorney General Theodore B. Olson, of the Office of Legal Counsel (OLC), advised the Attorney General that "[a]lthough the attorney-client privilege traditionally has been recognized in the context of private attorney-client relationships, the privilege also functions to protect communications between government attorneys and client agencies or departments, as evidenced by its inclusion in the FOIA, much as it operates to protect attorney-client communications in the private sector." Memorandum for the Attorney General re: Confidentiality of the Attorney General's Communications in Counseling the President, 6

---

[2]Even those commentators who question whether the attorney-client privilege was extended to governments at "common law" agree "most" courts have recognized that governmental entities are entitled to the privilege. 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, § 5475, at 125 (1986). These commentators likewise predict the courts will continue to recognize that the privilege extends to governmental entities. Id. at 128. ("[I]t seems likely that some form of privilege for governmental clients will be recognized by federal courts applying Rule 501.") (citations omitted.)

Op. Off. Legal Counsel 481, 495 (1982) (citations omitted), <u>reprinted in</u>
Appellee's App. [hereinafter  <u>Att'y Gen.'s Mem.</u>].

OLC found convincing support for its position in <u>Upjohn Co. v. United</u>
<u>States</u>, 449 U.S. 383, 389-97 (1981) (applying attorney-client privilege in
corporate context, rejecting "control group test," and holding that
detailed information provided to corporate counsel by corporate managers,
who were not necessarily policy makers, regarding questionable payments by
corporation was protected from an IRS document summons under the attorney-
client privilege[3]).  <u>Att'y Gen.'s Mem.</u> at 495-96.

According to OLC, the President, no less than the Upjohn corporation,
required the attorney-client privilege so he could comply with the law by
insuring that subordinates talked candidly with counsel.  <u>Id.</u>  OLC
reasoned:

> [I]t is likely that, in most instances, the 'client' in the
> context of communications between the President and the
> Attorney General, and their respective aides, would include the
> broad scope of White House Advisers in the Office of the
> President.  The 'functional' analysis suggested by <u>Upjohn</u>
> focuses on whether the privilege would encourage the
> communication of relevant and helpful information from advisors
> most familiar with the matters on which legal assistance is
> sought, as well as whether the privilege is necessary to
> protect and encourage the communication of frank and candid
> advice to those responsible for executing the recommended
> courses of action.

---

[3]In addition, the Court held that to the extent they
reflected the mental impressions of counsel, the documents were
also protected from disclosure by the "work product" doctrine.
<u>Id.</u> at 401-02.  To the extent the notes in this case are "work
product," they too would be protected under the "work product"
doctrine of <u>Upjohn</u>.

Id. at 496.

If this court has to make a choice when discovering the common law as applied to the White House, we ought to choose the analysis contained in the Memorandum for the Attorney General. I am particularly opposed to the adoption of the position urged by the IC because it is contrary to the long-standing policy of the Department of Justice.

To avoid Upjohn, it is argued that the White House is different from a corporation in three distinguishing respects. It is argued that the White House cannot be prosecuted for a crime. The IC also argues that White House lawyers, unlike counsel for corporations, have a statutory responsibility to report crimes. Finally, it is claimed that the White House, as opposed to a corporation, has a duty to further honest government.

Since the Upjohn decision was not based upon the fact that a corporation could be prosecuted for a crime, it is an irrelevancy to distinguish Upjohn on that basis. In Upjohn, the government pursued the exact opposite of the IC's argument here that the privilege does not apply because the White House cannot be prosecuted for a crime. In Upjohn the government argued that because corporations were subject to criminal liability corporations had a sufficient incentive to comply with the law and, therefore, corporations did not need the attorney-client privilege because they would seek legal advice in any event. The Court rejected this argument in a footnote. 449 U.S. at 393 n.2. Simply put, Upjohn did not turn on the presence or absence of criminal liability. Id.

More to the point, Upjohn reasoned that corporate policy makers legitimately need their lawyers to know the facts in order

-43-

for the corporation to comply with the law, and, absent the corporate attorney-client privilege, the fact-finding process would be impaired along with the corporation's ability to conform its conduct to the law after receiving fact-based legal advice. Id. at 389-97. Likewise, the Court reasoned that even minor corporate employees needed candid legal advice to insure that the corporation complied with the law, and absent the privilege such advice would not likely be forthcoming. Id. The same reasoning applies to the White House.

I also reject the related argument that we can distinguish Upjohn on the basis that a White House official who fears he or she may have violated the criminal law should speak to a private attorney, not a government lawyer. This argument misses the point for extending the privilege to organizations.

The organizational attorney-client privilege, be it asserted by the White House or Upjohn, is intended to encourage officials, who may be fearful of losing their jobs, their reputations, their privacy, or their liberty, to tell the organization the raw truth so it can comply with the law. The privilege is also premised upon the reasonable belief that no-nonsense legal advice generally depends upon confidentiality, and corporations need such advice if they are to comply with the law. In this regard, there is no reason to presume that the White House is different from Upjohn.

The argument that government lawyers, unlike corporate counsel, are required by statute to report crimes and this fact distinguishes White House counsel from corporate counsel, is built upon a false premise. While it is true that 28 U.S.C. § 535(b) requires governmental employees to report crimes, the Department of Justice has properly reasoned that the statute must be interpreted in conformity with, not in opposition to, the attorney-client

privilege. Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, Memorandum for the Deputy Attorney General re: Disclosure of Confidential Information Received by U.S. Attorney in the Course of Representing a Federal Employee at 2 (Nov. 30, 1976), ("[N]o information the employee conveyed to the Assistant U.S. Attorney in connection with the civil action may be used by the Department to prosecute the employee; nor may it be turned over to anyone else, such as the employing agency, for use against him."), reprinted in Appellee's App. Assistant Attorney General Scalia stated: "Given the absence of any discussion of the subject in the legislative history [regarding section 535(b)], it would in our view be inappropriate to infer a congressional purpose to breach the universally recognized and longstanding confidentiality of the attorney-client privilege." Id. at 6-7 (emphasis added).

The Department of Justice has consistently followed this advice. For example, in 1985 OLC stated that the "principal reason for our conclusion that the attorney-client privilege overrides § 535(b) is that confidentiality of communications between client and lawyer is essential if Department attorneys are to be able to provide adequate legal representation." Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, Duty of Government Lawyers Upon Receipt of Incriminating Information in the Course of an Attorney-Client Relationship With Another Government Employee at 6 (March 29, 1985) (citing prior opinions of OLC dating from 1978), reprinted in Appellee's App.

Lastly, the argument is advanced that the White House, but not a corporation, has a public duty to seek honest government. Therefore, it is argued, the attorney-client privilege should be ignored because it impedes an honest government's search for the truth. The "good government" argument is no basis for denying the privilege to the White House.

To recognize that the White House has an attorney-client privilege is not to adopt a "bad government" position though the existence of such a privilege may inhibit the IC from obtaining all the information he might like by making a demand upon the White House. As <u>Upjohn</u> recognized, the attorney-client privilege serves the public interest by promoting the "valuable efforts of corporate counsel to ensure their client's compliance with the law," especially in those areas of the law that are "hardly . . . instinctive." 449 U.S. at 392. The same thing can be said for the White House, <u>especially</u> because it has a duty to promote honest government. We should not premise our decision upon the assumption that the IC is the <u>only</u> guardian of just government.

In short, I reject the argument that the attorney-client privilege in the hands of the White House is antithetical to the interests of justice, though I acknowledge that the privilege may impede the work of the IC. When a prosecutor asks the court for help in invading the confidences of the President, the proper way to address the "public interest" question is not to pretend that the White House lacks the attorney-client privilege. On the contrary, the court should carefully balance, as <u>Nixon</u> did, the competing governmental interests, subject to the procedural protections that <u>Nixon</u> carefully set forth.

### e.  Summary

Rule 503 is an accurate statement of the common law. The rule is therefore definitive, and we should apply it.

## 2. Application of Rule 503

Having determined that Rule 503 is definitive and that the governmental attorney-client privilege set forth in Rule 503 generally promotes the public interest when applied to the White House, we should apply the rule to this case. The White House possesses the attorney-client privilege because all the prerequisites for application of Rule 503(b)(1) have been established.

### a. White House As "Client" and Mrs. Clinton As "Representative"

Under Rule 503(a)(1), as applied to the evidence here, there is a "client." The "client" is the White House, acting through Mrs. Clinton in her representative role as First Lady. As noted earlier, Rule 503 explicitly extends the attorney-client privilege to "organizations" or "entities" that are "public" in nature. The rule also explicitly protects communications involving a "representative" of a client. Rule 503(b)(1) protects a "client's" discussions "between himself or his representative and his lawyer."

Mrs. Clinton is surely a "representative" of the White House. To the extent the IC argues that Mrs. Clinton as First Lady should not be considered a "representative" of the White House, I reject the argument as factually and legally unsound.

Factually, the district court found that Mrs. Clinton, "like other First Ladies before her, has a widely recognized role as an advisor to the President and is generally considered to be a member of the President's inner circle." Slip. Op. at 10. The district court's finding is not clearly wrong.

Legally, "<u>Congress</u> itself <u>has</u> recognized that the President's spouse acts as the functional equivalent of an assistant to the President." <u>Association of Am. Physicians & Surgeons, Inc. v. Clinton</u>, 997 F.2d 898, 904 (D.C. Cir. 1993) (holding Mrs. Clinton was a "full-time officer or employee of federal government," relying on and quoting 3 U.S.C. § 105(e) (emphasis in original)). <u>See also</u>, <u>Att'y Gen.'s Mem.</u>, 6 Op. Off. Legal Counsel at 496 (attorney-client privilege covers the "broad scope of White House advisers in the Office of the President").

As a "member of the President's inner circle" of advisers, Mrs. Clinton is precisely the type of organizational "representative" the attorney-client privilege would ordinarily cover. <u>See, e.g.</u>, <u>Upjohn Co. v. United States</u>, 449 U.S. at 387-95; <u>In Re Bieter Co.</u>, 16 F.3d at 935-40 (granting a writ of mandamus and sustaining invocation of attorney-client privilege by partnership; applying <u>Upjohn</u> to a person who, although not an employee of the partnership, was a consultant; reaching this result because: (1) communications were made for the purpose of seeking legal advice; (2) it was reasonable to assume that client's principal directed consultant's communication with counsel; (3) it was reasonable to assume that client's principal directed the communication be made for the purpose of securing legal advice; (4) subject matter of discussion was within scope of the consultant's duties as evidenced by what consultant did; and (5) communications were held in confidence).

### b.  To Or From A Lawyer

It is undisputed that there were communications to or from White House counsel to or from the First Lady. <u>See</u> Rule 503(a)(2)&(b)(1). <u>Upjohn</u> makes clear that the privilege goes

both ways, that is, the privilege protects advice from a lawyer to a client, and it also protects statements made by a client to a lawyer for the purpose of informing the lawyer so the lawyer may give fact-specific advice to the client. 449 U.S. at 389-91. Thus, communications from the First Lady to White House counsel are protected just the same as communications to the First Lady from White House counsel.

### c. Confidential Communication

Given the undisputed facts presented in the declaration of White House counsel, (IC App. at 27 ¶ 16, 29-30 ¶¶ 20-21), as well as the facts presented in the declaration of Mrs. Clinton's personal lawyer, (IC App. at 35-37 ¶¶ 5-7), the communications recorded in the sought-after notes were intended to be "confidential" within the meaning of Rule 503(a)(4). These communications were not intended to be revealed to third parties, and they were not. Furthermore, recognizing (1) the explicit language of Rule 503, (2) the wide acceptance of a governmental attorney-client privilege by the federal courts, thoughtful commentators and the Department of Justice, (3) the Supreme Court's opinion in Upjohn, and (4) the fact that Nixon did not rule on a White House assertion of the attorney-client privilege, there was no reason for the White House, Mrs. Clinton, or the lawyers to doubt that the communications would be held in confidence.

The presence of Mrs. Clinton's personal lawyer does not change the result. As will be discussed more fully later, Mrs. Clinton, in her personal capacity, and the White House, as an entity represented by the First Lady in her official capacity, shared a legal "matter of common interest." Rule 503(b)(3) prevents

-49-

disclosure of communications "by [a client] or his lawyer to a lawyer representing another in a matter of common interest."

Among other things, both parties (the White House and Mrs. Clinton personally) needed to respond carefully and candidly to the IC; therefore, both required the advice of legal counsel. As a result, Rule 503(b)(3) explicitly protects communications between White House counsel and the First Lady even though a lawyer (Mrs. Clinton's personal lawyer) for another party (Mrs. Clinton in her personal capacity) was present.

### d. Facilitating the Rendition of Legal Services

Finally, the undisputed evidence establishes that the communications were made for the purpose of "facilitating the rendition of professional legal services" to the White House as the "client" within the meaning of Rule 503(b)(1).

The subject of the meeting that generated the first set of notes pertained to the death of a senior White House official (Vincent W. Foster) and Mrs. Clinton's activities immediately afterward. (IC App. at 27 ¶ 16.) The subject of the meeting that generated the second set of notes was the discovery of billing records involving Mrs. Clinton which were found at the White House and turned over to the IC as relevant evidence in his investigation. (IC App. at 28-30 ¶¶ 18-21, 35-37 ¶¶ 5-7.)

Both meetings, and the notes regarding them, pertained to events that directly involved the institutional functioning of the White House. It is reasonable to believe that White House counsel and Mrs. Clinton discussed her role as First Lady after the death of Mr. Foster and her role as First Lady regarding the discovery of

the billing records.  Moreover, the events that were the subject of these meetings between the First Lady and White House counsel are directly related to issues the IC was authorized to investigate concerning the White House as an institution.  Slip Op. at 2-3.  (IC authorized to investigate death of former Deputy White House Counsel Vincent W. Foster and discovery of Rose Law Firm billing records in the White House residence.)

Under these circumstances, it is reasonable to assume that the President (or another principal at the White House) directed the First Lady's communication with White House counsel for the purpose of securing legal advice for the White House.  In Re Beiter Co., 16 F.3d at 938-39 (making similar assumptions in context of a partnership consultant).

Ignoring for the moment Mrs. Clinton's personal stake in the matter, the White House as a "client" had a legitimate and independent institutional reason to pursue the two conferences between its "representative" (Mrs. Clinton) and its "lawyers" (White House counsel) for the "purpose of facilitating the rendition of professional legal services to the client [the White House]."  Rule 503(b)(1).  White House lawyers had a legitimate institutional need to know what the client's "representative" knew in order to advise the "client," including the client's "representative," what to do or not do.  In particular, the White House had a legitimate institutional need for the advice of its lawyers so that, acting through people, including the First Lady, as it must, the White House could carefully and candidly respond to the IC.

The decision to turn over billing records to the IC, records that although discovered at the White House also involved Mrs. Clinton in her personal capacity, is proof of the White

House's legitimate institutional need to have its lawyers advise and consult with the "client's representatives," including individuals such as the First Lady. On January 4, 1996, Jane C. Sherburne, special counsel to the President, learned that Ms. Carolyn Huber, a White House employee, had located in the White House residence a copy of billing records relating to the work performed by attorneys at the Rose Law firm, including Mrs. Clinton, for Madison Guaranty. (IC App. at 28 ¶ 18.) Ms. Sherburne, in consultation with Mrs. Clinton's personal lawyer, decided that the records should be promptly turned over to the IC, the Senate Whitewater Committee, the House Banking Committee, the FDIC and the RTC, and the records were in fact turned over to those governmental bodies. (Id.) The production of these documents caused the IC, among others, to launch an investigation relating to the finding of the billing records. (Id.)

As the Supreme Court has recognized, the attorney-client privilege is extended to organizations so the people who ultimately effect the policy of an organization can comply with the law by obtaining information from subordinates and then directing those subordinates to comply with the law. Upjohn, 449 U.S. at 390-93. The handling of the billing records here proves why the Upjohn rationale for extending the attorney-client privilege to corporations, acting as they must through people, is also applicable to the White House.

### e. Summary

There was (1) a communication to or from Mrs. Clinton in her role as an "inner-circle" representative of the client White House, Rule 503(a)(1)&(b)(1); (2) to or from a White House lawyer, Rule 503(a)(2); (3) intended to be confidential, Rule 503(a)(4); (4) for the purpose of seeking, obtaining, or providing legal

assistance to the client White House, Rule 503(a)(4)&(b)(1). These findings establish that the White House has the attorney-client privilege it asserts. See also In Re Bieter Co., 16 F.3d at 935-40.

### B. Balancing the Public Interest

Assuming the White House possesses the attorney-client privilege, two issues must be resolved. First, we must decide whether the IC could ever be entitled to the notes when the White House asserts the attorney-client privilege. Second, we must address the issue of what procedural protections must be employed to protect the White House's legitimate need for confidentiality, assuming the privilege is not an absolute bar and that production may be required under certain circumstances. Both inquiries require a careful balancing of the interests of the White House and the IC to preserve and protect the public interest that both governmental entities seek to promote.

### 1. Nixon's Balancing Test

While the White House generally has the attorney-client privilege it asserts here, this case is unprecedented. Never have the courts been confronted with (1) a motion by an independent counsel (himself a singularly unique creature under federal law) in a criminal investigation (2) to enforce a grand jury subpoena for documents directed at the White House (3) under circumstances where enforcement of the subpoena would pierce the attorney-client privilege enjoyed by the White House.

Once we decide that the White House has a privilege that the IC seeks to overcome, the only precedent that matters is United

States v. Nixon, 418 U.S. 683. A brief summary of that case is helpful.

The Nixon court held that the public interest requires that presidential confidentiality be afforded the greatest possible protection consistent with the fair administration of justice. Nevertheless, the Court also held that the President was required to turn over taped conversations to the district court pursuant to a trial subpoena issued at the request of a special prosecutor under Federal Rule of Criminal Procedure 17(c), despite the President's assertion of Executive Privilege.

The special prosecutor had made a preliminary showing of specific need, relevance, and admissibility before a federal district judge. The Supreme Court suggested that such a showing was always required when the President invoked a privilege.

The Court then attempted to balance the twin concepts of "public interest" asserted by the President and the special prosecutor. The Court stated that "when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." Id. at 713.

As an additional precaution, the Court required the district court to conduct an in camera examination of the tapes after the order for production was issued, but before they were turned over to a special prosecutor. The purpose of this examination was to decide whether the tapes were actually relevant and admissible.

Now, as in Nixon, both the White House and the IC assert that the "public interest" warrants a finding for their particular position. As between these governmental entities, I agree that the

"public interest" is the value to be preserved by our ruling.  As a result, the dispute comes down to this:  Is the White House's attorney-client privilege generally more important than a grand jury's criminal investigation of the White House?

At this elevated level of abstraction, Nixon teaches that the President's general need for confidentiality (expressed here by the attorney-client privilege) is outweighed by a grand jury's need for evidence of the truth.[4]  The Department of Justice has taken a similar view in the past.  See Att'y Gen.'s Mem., 6 Op. Off. Legal Counsel at 487-88 ("The more generalized the executive interest in withholding the disputed information, the more likely it is that the claim of privilege will yield to a specific, articulated need related to the effective performance by the coordinate branches of their constitutionally assigned functions.") (citing Nixon).

The White House has not articulated the specific harm to the public interest that would occur if this subpoena was enforced.  Nixon addressed a similar issue and concluded that "[a]bsent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications of such material is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide."  Id. at 706.  Therefore, I would find that, assuming the procedural protections afforded the White House by Nixon are observed, the attorney-client privilege may be invaded.[5]

---

[4]The same analysis justifies piercing the work product "privilege."

[5]However, as did the Supreme Court in Nixon, I would limit the holding to criminal investigations involving special prosecutors (and not to civil cases or congressional hearings). Nixon, 418 U.S. at 712 n.19.

This is not a conclusion to be reached lightly.  The White House has a strong argument that an attorney-client privilege which is not absolute is no privilege at all.  Upjohn, 449 U.S. at 393.  Moreover, as discussed in more detail later, Nixon specifically recognized that the attorney-client privilege was an exception to the general rule that "the public . . . has a right to every man's evidence."  418 U.S. at 709-10.

Nevertheless, Nixon ultimately teaches that the number of times the President's confidences may be invaded will be few.  The only time such confidences may be probed is when the procedural protections carefully articulated by Nixon have been satisfied.  Accordingly, the attorney-client privilege, while not absolute, will retain vigor for the White House because the privilege will be overcome only infrequently and only after painstaking judicial scrutiny.

## 2.  Nixon's Procedural Protections

The White House suggests the IC is on a "fishing trip."  After all, the IC could simply call Mrs. Clinton to testify before the grand jury, as he has done in the past, to investigate her knowledge of the facts. Consequently, it is reasonable to ask: why does the IC need the privileged notes?

We ought to be very cautious about assuming that the IC needs to invade the White House attorney-client privilege to obtain the facts. Upjohn forcefully made this point:

> Here the government was free to question the employees who communicated with Thomas [corporate counsel] and outside counsel. . . . While it would probably be more convenient for the government to secure the results . . . by simply subpoenaing the . . . notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege.

449 U.S. at 396.

If we require a preliminary showing of specific need, relevance, and admissibility to a district judge as Nixon clearly did, 418 U.S. at 700-02, 713-14, such a requirement would (1) prevent the use of a grand jury subpoena as part of an improper "fishing expedition" and (2) insure that the White House attorney-client privilege was not lightly overturned. Fidelity to Nixon requires that we approve the invasion of the White House attorney-client privilege when absolutely necessary, but fidelity to Nixon also requires that we extend to the White House the protections that Nixon set forth before such an invasion takes place.

To avoid the preliminary showing requirement, the IC makes much of the fact that Nixon involved a trial subpoena and this case does not. The IC further points out that the preliminary showing requirement of Nixon was (in part) based upon Fed. R. Crim. P. 17(c) which deals with trial subpoenas. Two responses make the IC's arguments unpersuasive.

Initially, Nixon repeatedly cautions that the unique interests of the Presidency, not merely Rule 17(c), warrant active judicial supervision with a threshold showing of need, relevance, and admissibility. Id. at 702, 713-16. Quite apart from Rule 17(c), early precedent required a showing that "the Presidential material was 'essential to the justice of the [pending criminal] case.'" Id.

at 713 (quoting <u>United States v. Burr</u>, 25 F. Cas. 187, 192 (C.C. Va. 1807) (No. 14,694)) (brackets in <u>Nixon</u>).

Moreover, I am unconvinced by the logic of the IC's argument. I do not believe a grand jury subpoena is <u>more</u> important than a criminal trial subpoena such that the procedures required by <u>Nixon</u> should be cast aside when the IC decides to cause the issuance of grand jury subpoena aimed at the White House.

Given the difference between a grand jury proceeding and a trial, the need, relevance and admissibility standard would be judged considering the nature of the proceeding. For example, treating impeachment evidence more liberally might be appropriate. <u>Compare</u> <u>Nixon</u>, 418 U.S. at 701. <u>Nixon</u> left these issues to the "sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." <u>Id.</u> at 702. Nevertheless, the investigative nature of a grand jury is no reason for the wholesale disregard of the protections that <u>Nixon</u> affords the unique status of the Presidency.

Even a favorable ruling for the IC at the first stage of the proceedings would not mean that the IC would ever see the notes. Assuming that a threshold showing had been made, <u>Nixon</u> required that the notes be delivered to the district court, not to the special prosecutor. <u>Nixon</u>, 418 U.S. at 713-16. After that, the district court was required to make an <u>in camera</u> examination of the notes. <u>Id.</u>

With the notes before it,[6] the court would (1) determine whether the notes were relevant and admissible; (2) ensure that they were treated with the sensitivity any Presidential papers command; and (3) require that the irrelevant portions of the notes (if any) be promptly returned to the White House under seal.  Id.  The White House is entitled to similar protections when served with a grand jury subpoena that invades the attorney-client privilege, and I disagree with the refusal to extend such protection to the White House.

### 3.  Threshold Showing

The White House contends the IC has not made a sufficient initial showing of specific need, relevance, and admissibility.  The district court did not reach this issue.  The IC does not argue that he satisfied Nixon.  He assumes that he was not required to make such a showing.  He does not brief the question of whether he made a sufficient showing.  Accordingly, we need not decide for the first time on appeal whether the IC accidentally made the required showing.

### III.  Mrs. Clinton

Mrs. Clinton has an attorney-client privilege that protects against disclosure of the notes.  However, as noted earlier, this court should also rule for the first time that the White House privilege must give way to a grand jury subpoena issued under the supervision of an independent counsel if the procedural protections of Nixon are satisfied.  Consequently, once Mrs. Clinton has been

---

[6]Although the district court could seek the help of the IC and White House counsel, it could not make a disclosure until the proper examination had been completed.  Id. at 715 n.21.

advised by virtue of our opinion that she can no longer reasonably believe her conversations with White House counsel will be held in confidence in every circumstance, consistent with Rule 503(a)(4) Mrs. Clinton will consult with White House counsel in the future at the risk of having her communications disclosed to the grand jury.

## A.  Mrs. Clinton and the Attorney-Client Privilege

The IC has conceded that in her personal capacity Mrs. Clinton is entitled to the protections of the attorney-client privilege regarding discussions with her private lawyers.  Slip. Op. at 12 n.5.  The IC can take no other position.  Rule 503(a)(1)&(b)(1).

The IC appears to argue that Nixon applies to Mrs. Clinton in her personal capacity.  Alternatively, the IC argues that even if Nixon does not apply to Mrs. Clinton, she lost her personal privilege by sharing her thoughts with White House lawyers. I disagree on both counts.

## 1.  Nixon Does Not Apply to Mrs. Clinton

Although it is unclear, the IC may argue not only that Nixon overcomes the White House privilege, but also that it justifies disallowing Mrs. Clinton's personal attorney-client privilege to the extent that there were communications shared with White House counsel.  If this is the IC's contention, I am not persuaded.

Nixon specifically recognized that the attorney-client privilege was an exception to the general rule that "the public . . . has a right to every man's evidence," stating:

> [T]he Fifth Amendment to the Constitution provides that no man
> "shall be compelled in any criminal case to be a

> witness against himself." And, generally, an attorney . . .
> may not be required to disclose what has been revealed in
> professional confidence. These and other interests are
> recognized in law by privileges against forced disclosure,
> established in the Constitution, by statute, or at common law.

Id. at 709-10.

Despite Nixon's recognition of the transcendent value of the attorney-client privilege, it is a reasonable extension of Nixon to pierce the organizational attorney-client privilege asserted by the White House. Such an extension is appropriate because the Nixon opinion instructs that generalized governmental confidentiality privileges are on balance less important than the government's search for the truth when both governmental interests are compared with the "public interest."

It is quite a different thing to retroactively deny the protection of the attorney-client privilege to an individual like Mrs. Clinton based on the "public interest." This distinction is important because the Fifth and Sixth Amendments protect Mrs. Clinton, unlike the White House, and a violation of her attorney-client privilege may also violate her constitutional rights. See, e.g., O'Brien v. United States, 386 U.S. 345 (1967) (although they were not revealed to prosecutors, governmental interception of conversations between a defendant and his lawyer required vacation of conviction) (relying upon Black v. United States, 385 U.S. 26 (1966)). Cf. Weatherford v. Bursey, 429 U.S. 545, 557 (1977) (explaining and distinguishing O'Brien and Black and stating "[t]his is not a situation where the State's purpose was to learn what it could about the defendant's defense plans" by intruding "on the lawyer-client relationship . . .").

In addition, and more significantly, the dispute between the White House and the IC solely involves the "public interest," while the dispute between the IC and Mrs. Clinton pits the "public interest" against "individual liberties," constitutional and otherwise. <u>Nixon</u> did not attempt to balance "public" and "individual" interests, and we thus lack any meaningful guidance on the matter.

Given the Supreme Court's historic respect for the attorney-client privilege[7] and the <u>Nixon</u> opinion's recognition that the attorney-client privilege normally trumps the rule that "the public . . . has a right to every man's evidence," we should not expand <u>Nixon</u> beyond disputes between governmental entities such as the White House and the IC.

## 2. The "Common Interest" Provision Protects Mrs. Clinton

To avoid the difficulty of applying <u>Nixon</u> to Mrs. Clinton, the IC alternatively argues that even if the communications evidenced by the notes are "confidential" within the meaning of Rule 503(a)(4), Mrs. Clinton and her personal lawyers shared their thoughts with White House lawyers, and Mrs. Clinton lost her personal privilege as a result. I disagree.

---

[7]<u>See, e.g.</u>, <u>Upjohn</u>, 449 U.S. at 389 (stating "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law"); <u>Hunt v. Blackburn</u>, 128 U.S. 464, 470 (1888) (stating the privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

The rule protects otherwise "confidential" communications made by the "[client] or his lawyer to a lawyer representing another in a matter of common interest." Rule 503(b)(3). The "common interest" provision of Rule 503 "is in accord with previous federal practice in recognizing a privilege both for inter-attorney communications and joint conferences where the client communicates to the other attorney directly." 2 Jack B. Weinstein et al., Weinstein's Evidence ¶ 503[06], at 503-99 (footnote omitted). Accord John Morrell & Co. v. Local Union 304A, 913 F.2d 544, 555-56 (8th Cir. 1990) (recognizing and sustaining "joint defense" privilege as to an internal memorandum written by corporate general counsel that was shared with codefendants in another case), cert. denied, 500 U.S. 905 (1991) (citations omitted). See also United States v. American Tel. & Tel. Co., 642 F.2d 1285, 1300 (D.C. Cir. 1980) (since "MCI shares common interests with the United States," MCI did not waive the work product privilege by sharing documents with the government).

The rule applies "not only if litigation is current or imminent but, consistently with the rest of the Standard, whenever the communication was made in order to facilitate the rendition of legal services to each of the clients involved in the conference." 2 Jack B. Weinstein et al., Weinstein's Evidence ¶ 503[06], at 503-99 (footnote omitted). Drafters of the "common interest" provision of the rule "intended the privilege to be broadly construed in multi-party situations." Id. at 503-100 (footnote omitted).

The evidence and the findings of the district court establish that there were two "clients," the White House, represented by Mrs. Clinton in her role as First Lady, and Mrs. Clinton personally; each "client" was in turn represented by separate lawyers regarding matters of "common interest." Consider again the apparent joint decision of the White House and Mrs. Clinton to turn

over to the IC the billing records found at the White House.  As a categorical matter, the "common interest" provision of Rule 503(b)(3) plainly applies to Mrs. Clinton and the White House because both legitimately needed the advice of separate lawyers in order to carefully and candidly respond to the IC, among others.

The IC argues that the White House does not have the attorney-client privilege, or that if it does, <u>Nixon</u> overcomes the privilege and Mrs. Clinton cannot personally claim that the "common interest" rule protects her communications.  The IC asserts that Mrs. Clinton loses the protection of the attorney-client privilege once the White House does.  This argument fails for two reasons.

As demonstrated earlier, the White House has the attorney-client privilege.  Since the White House has always possessed the privilege, the IC cannot properly argue that Mrs. Clinton loses the "common interest" protection because the White House lacked the attorney-client privilege in the first place.  The White House had the privilege then and has it now. <u>Nixon</u> may overcome, but it does not erase, the White House privilege.

Next, I agree, as indicated earlier, that, by extension of the <u>Nixon</u> reasoning, the White House attorney-client privilege must give way under certain very limited circumstances.  However, a precedent making extension of <u>Nixon</u> to the White House's attorney-client claim does not justify denying Mrs. Clinton the protection of her personal attorney-client privilege safeguarded by the "common interest" provisions of the rule.

The IC has cited no case, nor have I found one, remotely suggesting that a party otherwise protected by the "common interest" provision of the attorney-client privilege loses that protection because a court determines after the fact <u>for the first</u>

time that the other party's attorney-client privilege must, on balance, give way. We have pointedly recognized that it is "fundamental that the 'joint defense privilege cannot be waived without the consent of all parties to the defense.'" John Morrell & Co., 913 F.2d at 556 (citation omitted) (emphasis added). Mrs. Clinton, not this court retroactively applying a first time ruling regarding the White House, must waive the privilege before the grand jury may examine the notes the IC seeks.

### B. Mrs. Clinton, the White House, and the Future

Rule 503(a)(4) states that a "communication is 'confidential' if not intended to be disclosed to third persons . . . ." The committee notes state that "intent is inferable from the circumstances." 2 Jack B. Weinstein et al., Weinstein's Evidence ¶ 503(a)(4)[01], at 503-39. See 56 F.R.D. 238 advisory committee's note.

Once aware by virtue of our opinion that her conversations with White House counsel may be disclosed to the grand jury because the White House may be obligated to respond to a subpoena under certain limited conditions, if Mrs. Clinton continues to have such conversations in the future she can no longer "intend" for the privilege to protect these conversations from a grand jury subpoena. See, e.g., 2 Jack B. Weinstein et al., Weinstein's Evidence ¶ 503(a)(4)[01], at 503-39 & n.2 (citing, among other cases, Hollings v. Powell, 773 F.2d 191, 196-97 (8th Cir. 1985), cert. denied, 475 U.S. 1119 (1986) (where mayor later testified to conversations with city attorney in a suit brought against mayor and city, the conversation was not intended to be confidential and the privilege was waived)).

## IV. Conclusion

As between the IC and the White House, we must faithfully apply the <u>Nixon</u> decision because there is insufficient reason to distinguish that case from this one.  As between the IC and Mrs. Clinton, we should understand the limits of the <u>Nixon</u> decision, and respect the fact that we are dealing with the rights of an individual.  I would affirm the district court's prudent refusal to enforce the subpoena.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.